IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| READING INTERNATIONAL, a Nevada corporation, | ) ) ) | CIV. NO. 13-00133 JMS-KSC |
| Plaintiff, | ) ) ) | ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR |
| vs. | ) ) | SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, MOTION FOR |
| THE MALULANI GROUP, LIMITED, a Hawaii corporation, | ) ) ) | PARTIAL SUMMARY JUDGMENT, DOC. NO. 39; AND (2) DENYING |
| Defendant. | ) ) ) | PLAINTIFF'S COUNTER-MOTION FOR SUMMARY JUDGMENT, DOC. NO. 58 |

**ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT, DOC. NO. 39; AND (2) DENYING PLAINTIFF'S COUNTER-MOTION FOR SUMMARY JUDGMENT, DOC. NO. 58**

## I. INTRODUCTION

On March 19, 2013, Plaintiff Reading International ("Plaintiff" or "Reading") filed this action alleging that Defendant The Malulani Group, Limited ("Defendant" or "TMG") breached a settlement between the parties by failing to provide timely financial statements for certain leased properties, provide access to financial books and records, and certify that Defendant used its best efforts to destroy certain materials from a prior litigation.

Currently before the court is Defendant's Motion for Summary Judgment, and Plaintiff's Counter-Motion for Summary Judgment, in which the parties dispute whether Defendant breached the parties' agreement, whether any breaches are curable, and whether Defendant cured the breaches. Based on the following, the court finds that the undisputed facts establish that the breaches at issue were subject to cure but that factual questions remain as to whether Defendant did indeed cure some of those breaches. The court therefore GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment, and DENIES Plaintiff's Counter-Motion for Summary Judgment.

## II. <u>BACKGROUND</u>

### A. **Factual Background**

In 2006, Plaintiff purchased stock in Defendant's subsidiary, Malulani Investments Limited ("MIL") for $1.8 million. *See* Doc. No. 40, Def.'s Concise Statement of Facts ("CSF") ¶ 1.[1] Six months later, Plaintiff commenced litigation against MIL and its directors in Hawaii state court (the "Hawaii Action"), after which time Defendant intervened. *Id.* Plaintiff, a minority shareholder in MIL, brought the Hawaii Action alleging that MIL refused to provide shareholder

---

[1] Where the parties do not dispute a particular fact (or a portion of a fact) contained in a CSF, the court cites directed to that party's CSF.

information and blocked efforts by the minority-appointed director, James Cotter, to participate in the management and direction of MIL. *See* Doc. No. 59, Pl.'s CSF ¶ 1. From June 2008 to February 2009, Plaintiff and Defendant mediated their dispute, resulting in a July 2009 settlement. Doc. No. 40, Def.'s CSF ¶ 2.

Pursuant to the July 2009 settlement, Defendant repurchased its stock from Plaintiff, and Plaintiff received $2.5 million in cash and a three-year interest-bearing note for $6.75 million. *Id.* ¶ 3. This overall agreement was documented in the following five interrelated agreements ("Settlement Documents"):

1.  Settlement Agreement dated July 2, 2009 ("Settlement Agreement"), Doc. No. 40-3, Def.'s Ex. 2;

2.  Secured Promissory Note ("Promissory Note"), Doc No. 40-4, Def.'s Ex. 3;

3.  Mortgage, Assignment of Leases and Rents, Security Agreement, Financing Statement and Fixture Filing dated July 2, 2009, encumbering Defendant's right, title, and interest in real property referred to as the Kokua Market Property ("Mortgage"), Doc. No. 40-5, Def.'s Ex. 4;

4.  Shareholder Pledge Agreement dated July 2, 2009, in which Defendant granted a security interest in and pledged to Plaintiff all of its right, title, and interest in the shares of MBL Maryland, Inc., whose sole asset is a property known as the West Maui Center ("MBL Pledge Agreement"), Doc. No. 40-6, Def.'s Ex. 5; and

5.    Collateral Assignment of Membership Interests
dated July 2, 2009, in which Defendant granted a
security interest and pledged to Plaintiff all of its
right, title, and interest in its membership in
Lahaina C, LLC, whose sole asset is a property
known as the Kaiser Property ("Lahaina Pledge
Agreement"), Doc. No., 40-7, Def.'s Ex. 6.

*See also* Doc. No. 40, Def.'s CSF ¶ 3.

The court outlines the relevant provisions of these documents and the

facts regarding Defendant's alleged breaches as follows:

### 1.    *The Settlement Agreement*

The Settlement Agreement is between Plaintiff, Magoon Acquisition

and Development, LLC, and James Cotter on the one hand (defined as "Plaintiff

Parties" in the Settlement Agreement), and Defendant, MIL, Easton Manson, John

Dwyer, Jr., Philip Gray, and Kenwei Chong on the other hand (defined as

"Defendant Parties" in the Settlement Agreement).

The Settlement Agreement provides that in exchange for Plaintiff's

surrender of all of Plaintiff's stock in Defendant companies and other

consideration, Defendant Parties shall (1) deliver a cashier's check to Plaintiff for

$2.5 million; (2) issue the Promissory Note in the amount of $6.75 million; and

(3) secure the Promissory Note by providing the Mortgage on the Kokua Market Property, the MBL Pledge Agreement, and the Lahaina Pledge Agreement. *See* Doc. No. 40-3, Def.'s Ex. 2 § 2.2.

The Settlement Agreement also includes a provision regarding the confidentiality and destruction of an investigatory report regarding James Cotter (the "Kroll Report"), and an April 2, 2008 "Order Regarding Allegation of Improper Purpose by Special Master Michael N. Tanoue" (the "Tanoue Order"). The Settlement Agreement allows Defendant Parties forty-five days to procure and destroy all copies of these documents that are either in their possession (§ 5.2(a) of the Settlement Agreement) or in the possession of any related entities (§ 5.2(b) of the Settlement Agreement), and to certify in writing that their best efforts were used to comply with these obligations. *Id.* § 5.2(c). The Settlement Agreement further outlines restrictions on Defendant Parties' obligations to keep these documents confidential going forward. *Id.* § 5.2(d)-(g). The Settlement Agreement states that "this Section is material to this Agreement and has been necessary to induce Plaintiff Parties to enter this agreement." *Id.* § 5.2.

Finally, the Settlement Agreement provides that "time is of the essence as to each and every provision of this Agreement." *Id.* § 8.18. The Settlement Agreement also includes an integration clause, stating that "[t]his

Agreement (including the exhibits hereto which are an integral part hereof and the documents and instruments whose execution and delivery are contemplated herein) contains the final and entire agreement and understanding of the Parties regarding the subject matter hereof." *Id.* § 8.13.[2]

### 2. *The Promissory Note*

The Promissory Note states that Defendant promises to pay Plaintiff $6.75 million, plus interest at the rate of 6.25 percent per annum starting on the date of the Note. Doc. No. 40-4, Def.'s Ex. 3. These payments are due on a quarterly basis starting January 1, 2010. *Id.*

The Promissory Note further includes the following default provision:

> 3.     Event of Default; Default Interest; Late Charge.
>       (a)     Upon the occurrence of an Event of Default (as hereinbelow defined), the Indebtedness shall become immediately due and payable at the option of Holder. If Maker fails to pay any sums due under this Note or any instrument securing this Note on the date when the same is due, Maker shall pay to Holder upon demand a late charge on such sum in an amount equal to the lesser of (i) five percent (5%) of such unpaid amount, and (ii) the maximum late charge permitted to be charged under the laws of the State of Hawaii (a "Late Charge"). Maker will also pay to Holder, after an Event of Default occurs, in addition to the amount due and any Late Charges, all reasonable costs in collecting, securing, or attempting to

---

[2] The "documents and instruments whose execution and delivery are contemplated herein" include the Mortgage, the MBL Pledge Agreement, and the Lahaina Pledge Agreement. *See* Doc. No. 40-3, Def.'s Ex. 2 § 2.2.

collect or secure this Note or any instrument securing this Note, including, without limitation, court costs and reasonable attorneys' fees (including reasonable attorneys' fees on any appeal by either Maker or Holder and in any bankruptcy proceedings).

(b)     As used herein, the term "Event of Default" shall mean the occurrence of one or more of the following: (i) if Maker fails to make any scheduled payment of principal or interest on the date such payment is due, (ii) if Maker fails to pay any other amount payable pursuant to the Loan Documents (excluding principal due on the Maturity Date) within five (5) days after written notice from Holder, (iii) if Maker fails to pay the outstanding Indebtedness on the Maturity Date; or (iv) upon the occurrence of an "Event of Default" as such term is defined in the Mortgage or an other Loan Document.

*Id.* § 3.

### 3.     *The Mortgage, MBL Pledge Agreement, and Lahaina Pledge Agreement*

The Promissory Note was secured by the (1) Mortgage on the Kokua Market Property, (2) the MBL Pledge Agreement pledging TMG's interests in MBL Maryland Inc., whose sole asset was the West Maui Center, and (3) the Lahaina Pledge Agreement pledging TMG's interests in Lahaina C, LLC, whose sole asset was the Kaiser Property.  *See* Doc. No. 40-3, Def.'s Ex. 2 § 2.2.3; Doc. No. 40-4, Def.'s Ex. 3 § 6.  The court collectively refers to the Kokua Market Property, the West Maui Center, and the Kaiser Property as the "Collateral Properties."

The Mortgage, MBL Pledge Agreement, and Lahaina Pledge

Agreement all include similar language requiring Defendant to provide Plaintiff

"(i) annually within forty (40) days following the end of each calendar year, and

(ii) within twenty (20) days following the end of each calendar quarter a true,

complete, correct and accurate copy of [the Defendant company-at-issue's]

unaudited financial statement" for the period, "including a statement of operations

(profit and loss), a statement of cash flows, a calculation of net operating income, a

balance sheet, an aged accounts receivable report and such other information or

reports as shall be requested by [Plaintiff]." Doc. No. 40-5, Def.'s Ex. 4 § 2.5(b);

Doc. No. 40-6, Def.'s Ex. 5 § 15.3(b); Doc. No. 40-7, Def.'s Ex. 6 § 15.3(b). The

Mortgage further requires that Defendant provide for the Kokua Market Property

"within twenty (20) days following the end of each calendar quarter a true,

complete, correct and accurate rent roll and occupancy report for such period and

such other occupancy and rate statistics" as Plaintiff shall request in its discretion.

Doc. No. 40-5, Def.'s Ex. 4 § 2.5(c).

The Mortgage, MBL Pledge Agreement, and Lahaina Pledge

Agreement also include similar provisions defining an "Event of Default" and

outlining the timing for an opportunity to cure. For example, the Mortgage

provides:

Section 7.11 <u>Event of Default defined</u>. The occurrence of one or more of the following events shall be an "Event of Default" hereunder:

(i) the occurrence of the events identified elsewhere in the Note, this Mortgage, or the other Loan Documents as constituting an "Event of Default" hereunder or thereunder;

(ii) any breach by the "Defendant Party" (as such term is defined in the Settlement Agreement) of an obligation of such party under the Settlement Agreement or any other Settlement Agreement;

. . .

(vi) if Mortgagor shall fail to deliver to the Mortgagor [sic] any of the Financial Statements as required pursuant to Section 2.5 hereof;

. . .

(x) if a default shall be continuing under any of the other obligations, agreements, undertakings, terms, covenants, provisions or conditions of this Mortgage or any other Loan Document not otherwise referred to in this Section for ten (10) days after notice to the Mortgagor, in the case of any default which can be cured by the payment of a sum of money or for thirty (30) days after written notice, in the case of any other default (unless otherwise provided herein or in such other Loan Document); <u>provided,</u> <u>however,</u> that if such non-monetary default under this clause (i) is susceptible of cure but cannot reasonably be cured within such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period and thereafter shall be extended for such time as is reasonably necessary for Mortgagor in the exercise of due diligence to cure such default, but in no event shall such period exceed ninety (90) days after the original date.

Doc. No. 40-5, Def.'s Ex. 4 § 7.11.  The Mortgage further defines "Loan

Document" to include "the Note, this Mortgage or any other instrument securing

the Note."  *Id.* at "GRANT."

The MBL Pledge Agreement and the Lahaina Pledge Agreement

include similar clauses.  For example, the MBL Pledge Agreement provides:

> 7.1.  <u>Definition of Events of Default</u>.  Any of the
> following specified events shall constitute an "Event of
> Default" under this Agreement:
>
> (a)     the occurrence of the events identified elsewhere in
> this Agreement or the Loan Documents as constituting an
> "Event of Default" hereunder or thereunder;
>
> (b)     subject to subparagraph 7.1(i) below, any breach
> by a "Defendant Party" (as such term is defined in the
> Settlement Agreement) of an obligation of such party
> under the Settlement Agreement or any other Settlement
> Agreement;
>
> . . .
>
> (g)     if [Defendant] shall fail to deliver to [Plainitff] any
> of the Financial Statements required pursuant to Section
> 15.3 hereof;
>
> . . .
>
> (i)     if a default shall be continuing under any of the
> other obligations, agreements, undertakings, terms,
> covenants, provisions or conditions of this Agreement,
> the Lahaina Pledge, Mortgage, Note or any other Loan
> Document not otherwise referred to in this Section for ten
> (10) days after notice to [Defendant], in the case of any
> default which can be cured by the payment of a sum of
> money or for thirty (30) days after written notice, in the
> case of any other default (unless otherwise provided
> herein or in such other Loan Document); <u>provided,
> however</u>, that if such non-monetary default under this
> clause (i) is susceptible of cure but cannot reasonably be

> cured within such default within such thirty (30) day
> period and provided further that [Defendant] shall have
> commenced to cure such default within such thirty (30)
> day period and thereafter diligently and expeditiously
> proceeds to cure the same, such thirty (30) day period
> and thereafter shall be extended for such time as is
> reasonably necessary for [Defendant] in the exercise of
> due diligence to cure such default, but in no event shall
> such period exceed ninety (90) days after the original
> notice.

Doc. No. 40-6, Def.'s Ex. 5 § 7.1. In comparison to the Mortgage defining "Loan Documents" to include "the Note, this Mortgage or any other instrument securing the Note," Doc. No. 40-5, Def.'s Ex. 4 at "GRANT," the MBL Pledge Agreement defines "Loan Documents" as "the Note, this Agreement, the Mortgage or any of the other instruments referenced in the foregoing documents." Doc. No. 40-6, Def.'s Ex. 5 § 1.2. The language of Lahaina Pledge Agreement -- in outlining the opportunity to cure and definition of "Loan Documents" -- is substantially similar to the MBL Pledge Agreement. *See* Doc. No. 40-7, Def.'s Ex. 6 § 7.1.

Like the Settlement Agreement, the Mortgage, Lahaina Pledge Agreement, and MBL Pledge Agreement also include provisions stating that time is of the essence with respect to the performance the obligations under these documents. Doc. No. 40-5, Def.'s Ex. 4 § 8.9; Doc. No. 40-6, Def.'s Ex. 5 § 23(f); Doc. No. 40-7, Def.'s Ex. 6 § 23(f).

**4.    Plaintiff's Allegations of Defaults by Defendant**

Defendant did not provide Plaintiff quarterly financial information within twenty days after the close of third quarter of 2009.  As a result, Plaintiff sent Defendant a November 13, 2009 notice asserting that this failure to provide this information was an event of default under the Mortgage, MBL Pledge Agreement, and Lahaina Pledge Agreement.  Doc. No. 40-10, Def.'s Ex. 9, at 2-3. Plaintiff demanded full payment of the principal of the Note, and further elected, among other things, to inspect the books and records of MBL Maryland and Lahaina C.  *Id.* at 5.

Defendant responded on November 16, 2009, stating its understanding that the obligation to make payments under the Promissory Note and provide financial information did not begin until the end of the first full quarter, which would be December 31, 2009.  Doc. No. 40-11, Def.'s Ex. 10.  Defendant nonetheless provided profit and loss statements, cash flow statements, and balance sheets for the Collateral Properties.  *Id.*

On November 19, 2009, Plaintiff notified Defendant that (1) it disagreed with Defendant's interpretation of when the financial reporting obligations began, (2) the events of default were not curable, and (3) Plaintiff wished to proceed with mediation.  Doc. No. 40-12, Def.'s Ex. 11.  On December

4, 2009, Plaintiff reiterated its request to inspect and copy the books for MBL and Lahaina C, and asserted that such refusal was an additional event of default. Doc. No. 40-15, Def.'s Ex. 14.

On December 16, 2009, Plaintiff notified Defendant that another default occurred when Defendant failed to provide a complete certification regarding the Kroll Document and the Tanoue Order as required by § 5.2 of the Settlement Agreement. Doc. No. 40-17, Def.'s Ex. 16. On August 14, 2009, Defendant had provided Plaintiff two "Certification[s] by Defendant Parties" -- the first signed by all Defendant Parties stating that they used their best efforts to comply with § 5.2(a) of the Settlement Agreement requiring them to destroy all copies of this documents, and the second signed by all Defendant Parties except Philip Gray and Kenwei Chong that they used their best efforts to comply with § 5.2(b) of the Settlement Agreement requiring them to destroy all copies of these documents in the possession or control of their related entities. Doc. No. 40-9, Def.'s Ex. 8. According to Plaintiff, Philip Gray's and Kenwei Chong's failure to certify compliance with § 5.2(b) constituted a default. *See* Doc. No. 40-17, Def.'s Ex. 16. On December 21, 2009, TMG provided amended certifications under § 5.2 of the Settlement Agreement for Philip Gray and Kenwei Chong. Doc. No. 40, Def.'s CSF ¶ 8; Doc. No. 40-18, Def.'s Ex. 17.

On December 30, 2009, the parties began mediation. *See* Doc. No. 40-14, Def.'s Ex. 13; Doc. No. 40-25, Def.'s Ex. 24. During this process, the parties agreed for Plaintiff to perform its inspection of records on February 23, 2010, *see* Doc. No. 40-25, Def.'s Ex. 24, and Plaintiff conducted an inspection on this date. Doc. No. 57, Pl.'s Resp. to Def.'s CSF ¶ 19. On October 26, 2010, Plaintiff terminated mediation. Doc. No. 40-37, Def.'s Ex. 36.

### 5. *The California Action*

In May 2011, Defendant notified Plaintiff that it intended to prepay the balance on the Promissory Note, *see* Doc. No. 40-40, Def.'s Ex. 39, and on June 7, 2011, Defendant made such payment. Doc. No. 40-43, Def.'s Ex. 42. As a result of this prepayment, the Mortgage, MBL Pledge Agreement, and Lahaina Pledge Agreement were terminated. Doc. No. 40, Def.'s CSF ¶ 25.

In the meantime, on May 12, 2011, Plaintiff filed a complaint in California state court asserting that Defendant breached the parties' agreements (the same alleged breaches as in this action) (the "California Action"). *See* Doc. No. 40-54, Def.'s Ex. 51. On December 15, 2011, the California Action was dismissed for lack of personal jurisdiction, Doc. No. 40-55, Def.'s Ex. 52, and on February 17, 2012, Defendant was awarded its attorneys' fees. Doc. No. 40-56,

Def.'s Ex. 53.  These determinations were affirmed on appeal.  Doc. No. 40-57,

Def.'s Ex. 54.

**B.    Procedural History**

On March 19, 2013, Plaintiff filed this action alleging claims against

Defendant titled (1) Breach of Secured Promissory Note; (2) Breach of Contract;

and (3) Declaratory Relief.  Plaintiff's claim for damages in this action includes not

only the payment of default penalties as outlined in the parties' agreements, but

also the attorneys' fees and costs incurred in connection with the California Action.

*See* Doc. No. 40, Def.'s CSF ¶ 30.

On January 22, 2014, Defendant filed its Motion for Summary

Judgment.  Doc. No. 30.  Plaintiff filed an Opposition and Counter-Motion on

March 3, 2014, Doc. No. 58, Defendant filed a Reply and Opposition to the

Counter-Motion on March 10, 2014, Doc. No. 62, and Plaintiff filed a Reply in

///

///

///

///

///

///

support of its Counter-Motion on March 17, 2014. Doc. No. 71.[3]  A hearing was

held on April 14, 2014.

### III.  **STANDARD OF REVIEW**

Summary judgment is proper where there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who

fails to make a showing sufficient to establish the existence of an element essential

to the party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of*

*Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of

informing the court of the basis for its motion and of identifying those portions of

the pleadings and discovery responses that demonstrate the absence of a genuine

issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's*

---

[3]  Defendant also filed Objections to the Declarations of Rex Y. Fujichaku and S. Craig Tompkins, Doc. No. 63, and Plaintiff filed a response.  Doc. No. 72.  These Declarations are largely unhelpful as they merely restate the language any of the Settlement Documents or otherwise purport to offer Plaintiff's subjective intent as to certain provisions.  As described below, neither party asserts that the agreements are ambiguous and the court likewise sees no ambiguity that would permit consideration of extrinsic evidence to interpret the Settlement Documents.

*Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

> "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

# IV. ANALYSIS

The parties raise opposing summary judgment arguments regarding whether Defendant breached the Settlement Documents, whether those breaches were subject to the cure provisions provided in some of the Settlement Documents, and if so, whether Defendant timely cured any alleged breach.[4] The court first outlines contract interpretation principles applicable to the Settlement Documents, and then addresses each alleged breach in turn.

## A. Contract Interpretation Principles Relevant to the Settlement Documents

"[A]s a general rule, the construction and legal effect to be given a contract is a question of law." *Found. Int'l, Inc. v. E.T. Ige Const., Inc*., 102 Haw. 487, 494-95, 78 P.3d 23, 30-31 (2003) (citation and quotations omitted).[5] "Absent an ambiguity, contract terms should be interpreted according to their plain, ordinary, and accepted sense in common speech." *Id*. at 495, 78 P.3d at 31 (citation and quotations omitted); *see also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 108, 839 P.2d 10, 24 (1992) (providing that "[t]erms of a contract

---

[4] Defendant also argued that Plaintiff is not entitled to its attorneys' fees from the California Action. Doc. No. 39, Def.'s Mot. at 2. At the April 14, 2014 hearing, Defendant clarified that it was not asking the court to rule on this issue at this time.

[5] Each of the Settlement Documents provides that Hawaii law applies, and the parties do not dispute that Hawaii law applies.

should be interpreted according to their plain, ordinary and accepted use in common speech, unless the contract indicates a different meaning"). Context matters -- "a contract should be construed as a whole and its meaning determined from the entire context and not from any particular word, phrase, or clause." *Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n, Inc*., 113 Haw. 77, 92, 148 P.3d 1179, 1194 (2006) (citations and quotations omitted). The court looks "no further than the four corners of the contract to determine whether an ambiguity exists," and "the parties' disagreement as to the meaning of a contract or its terms does not render clear language ambiguous." *Stanford Carr Dev. Corp. v. Unity House, Inc*., 111 Haw. 286, 298, 141 P.3d 459, 471 (2006) (citations and quotations omitted). An "ambiguity is found to exist . . . only when the contract, taken as a whole, is reasonably subject to differing interpretation." *Sturla, Inc. v. Fireman's Fund Ins. Co.*, 67 Haw. 203, 209-10, 684 P.2d 960, 964 (1984).

In this action, the parties' agreement is not encompassed by a single document. Rather, the Settlement Documents, taken together, comprise the overall agreement between the parties -- the Settlement Documents reference one another and they were executed as part and parcel to settle the Hawaii Action. Indeed, the Settlement Agreement, the only Settlement Document to include an integration provision, provides that the parties' agreement is encompassed by all of the

19

Settlement Documents as a whole -- it provides that "[t]his Agreement (including the exhibits hereto which are an integral part hereof and the documents and instruments whose execution and delivery are contemplated herein) contains the final and entire agreement and understanding of the Parties regarding the subject matter hereof."  Doc. No. 40-3, Def.'s Ex. 2 § 8.13.  Thus, the court interprets each of the provisions at issue by considering not only the particular Settlement Document in which the provision appears, but also in context of all the Settlement Documents as a whole.

## B.    Failure to Comply with § 5.2 of the Settlement Agreement

The Complaint asserts that Defendant breached the Settlement Agreement by failing to timely certify compliance with § 5.2 regarding the destruction of the Kroll Report and the Tanoue Order.  *See* Doc. No. 1, Compl. ¶ 36.  The undisputed evidence establishes that while all "Defendant Parties" timely certified compliance with § 5.2(a) of the Settlement Agreement that they had destroyed these documents, Philip Gray and Kenwei Chong failed to certify pursuant to § 5.2(b) that they had used their best efforts to procure and destroy all copies of these documents in possession of related entities.  *See* Doc. No. 40-9, Def.'s Ex. 8.  Once Plaintiff notified Defendant of this deficiency, Defendant

provided a certification as to Section 5.2(b) signed by Philip Gray and Kenwei

Chong. Doc. No. 40-18, Def.'s Ex. 17.

The Settlement Agreement does not include a cure provision, and as a

result, the the parties dispute, among other things, whether a breach of the

Settlement Agreement takes benefit of the cure provisions provided in the other

Settlement Documents, and whether a violation of § 5.2 is susceptible to cure.[6]

## 1. *Whether a Breach of the Settlement Agreement Is Subject to Cure*

Although the Settlement Agreement does not itself contain a cure

provision, as explained above, the Settlement Documents together comprise the

parties' entire agreement. The question is therefore whether the cure provisions

contained in either the Mortgage, Lahaina Pledge Agreement, or MBL Pledge

Agreement are limited to each of those agreements or whether they apply to

breaches of the Settlement Agreement as well. Although the parties present

opposing interpretations of the cure provisions, neither party argues that they are

ambiguous. The court agrees there is no ambiguity, and construing the contract

terms "according to their plain, ordinary, and accepted sense in common speech,"

---

[6] The parties also dispute (1) whether a breach occurred, and (2) whether such breach was material. Because the court finds that Defendant was permitted to cure a breach of § 5.2 and in fact cured any purported breach, the court need not address these additional arguments.

finds that the cure provision in the MBL Pledge Agreement applies to breaches of the Settlement Agreement. *See Found. Int'l, Inc.*, 102 Haw. at 495, 78 P.3d at 31.

The cure provision of the MBL Pledge Agreement[7] includes (1) a subsection outlining what events constitute an "event of default," and (2) a subsection providing the deadlines by which a party has the opportunity to cure. Doc. No. 40-6, Def.'s Ex. 5 § 7.1. The first subsection outlines that an "event of default" includes, among other things, "subject to subparagraph 7.1(i) below, any breach by a Defendant Party . . . of an obligation of such party under the *Settlement Agreement* or any other Settlement Document." *Id.* § 7.1(b) (emphasis added). Thus, a breach of the Settlement Agreement is "subject to subparagraph 7.1(i)." In turn, § 7.1(i), the notice and cure subsection, provides:

> (i)     if a default shall be continuing under any of the other obligations, agreements, undertakings, terms, covenants, provisions or conditions of this Agreement, the MBL Pledge, Mortgage, Note or any other Loan Document not otherwise referred to in this Section . . . for thirty (30) days after written notice, in the case of any [nonmonetary] default (unless otherwise provided herein or in such other Loan Document); . . .

Although the notice and cure subsection does not expressly state that it applies to breaches of the Settlement Agreement, there is ample language in the

---

[7] The language in the Lahaina Pledge Agreement mirrors the language in the MBL Pledge Agreement. *See* Doc. No. 40-7, Def.'s Ex. 6 § 7.1. For ease of reference, the court refers only to the MBL Pledge Agreement.

MBL Pledge Agreement establishing that it does.  The opportunity to cure applies

to defaults of "this Agreement, the MBL Pledge, Mortgage, Note or any other Loan

Document not otherwise referred to in this Section."  *Id.*  And this language

includes the Settlement Agreement -- the MBL Pledge Agreement defines the term

"Loan Documents" to include "the Note, this Agreement, the Mortgage *or any of*

*the other instruments referenced in the foregoing documents*," *id.* § 1.2 (emphasis

added), and the Settlement Agreement is plainly an "instrument referenced" in the

Note, the Mortgage, and the MBL Pledge Agreement.

That a breach of the Settlement Agreement is subject to cure is

confirmed by § 7.1(b), which provides that an "event of default" includes, "subject

to subparagraph 7.1(i) below," any breach of the Settlement Agreement.  In other

words, a breach of the Settlement Agreement is "subject to" the cure provisions

outlined in subsection 7.1(i).  To construe the cure provision to *not* apply to

breaches of the Settlement Agreement would render this "subject to" language

meaningless.  *See Stanford Carr Dev. Corp.*, 111 Haw. at 297-98, 141 P.3d at 470-

71 ("We have long expressed our disapproval of interpreting a contract such that

any provision be rendered meaningless."); *see also* Restatement (Second)

Contracts, § 203(a) (1981) ("[A]n interpretation which gives a reasonable, lawful,

and effective meaning to all the terms is preferred to an interpretation which leaves

a part unreasonable, unlawful, or of no effect.") and cmt b ("Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous.").

Additional support for this construction is found in § 7.1(i)'s recital that the opportunity to cure applies to defaults of "this Agreement, the MBL Pledge, Mortgage, Note *or any other Loan Document not otherwise referred to in this Section*." (emphasis added). If "Loan Documents" was limited to all Settlement Documents except the Settlement Agreement, the "or any other Loan Document not otherwise referred to in this Section" would be superfluous where the sentence already expressly references each of the other Settlement Documents. *See Stanford Carr Dev. Corp.*, 111 Haw. at 297-98, 141 P.3d at 470-71.

In opposition, Plaintiff relies entirely on the cure provision in the Mortgage to argue that a breach of the Settlement Agreement is an "Event of Default" under the Mortgage, and that the cure provision of the Mortgage does not apply to such breaches. At the April 14, 2014 hearing, Plaintiff's counsel further clarified its argument, asserting that regardless of whether the MBL Pledge Agreement and Lahaina Pledge Agreement allowed Defendant to cure breaches of the Settlement Agreement, the cure provision of the Mortgage does not allow such

cure. Plaintiff therefore reasons that Defendant's breach of the Settlement

Agreement was a non-curable breach of the Mortgage.

The court recognizes that the cure provision of the Mortgage differs in

several minor respects from that of the MBL Pledge Agreement and Lahaina

Pledge Agreement. In particular, the Mortgage defines "Loan Document" in a

more limited fashion than the MBL Pledge Agreement -- the Mortgage defines

"Loan Document" to include "the Note, this Mortgage or any other instrument

securing the Note," Doc. No. 40-5, Def.'s Ex. 4 at "GRANT," while the MBL

Pledge Agreement defines "Loan Documents" as "the Note, this Agreement, the

Mortgage or any of the other instruments referenced in the foregoing documents."

Doc. No. 40-6, Def.'s Ex. 5 § 1.2. The Mortgage also excludes the "subject to

subparagraph 7.1(i) below" phrase in defining that a breach of the Settlement

Agreement is an "event of default." Doc. No. 40-5, Def.'s Ex. 4 § 7.11.

The court rejects, however, that these minor differences suggest that

Defendant was not permitted to cure breaches of the Settlement Agreement where

the plain language of the MBL Pledge Agreement and Lahaina Pledge Agreement

suggest otherwise. The parties entered into each of these agreements as a part of

an overall, integrated settlement, the agreements all relate to one another, and the

cure provisions of the agreements are substantially similar. Given these facts, it

would be absurd to interpret the agreements separately such that a breach of the Settlement Agreement on the one hand was subject to cure under the Lahaina Pledge Agreement and MBL Pledge Agreement, but not subject to cure under the Mortgage. The court instead determines the parties' intent by construing the cure provisions in context of the Settlement Documents as a whole. *See Haw. Med. Ass'n*, 113 Haw. at 92, 148 P.3d at 1194.

In sum, the court finds that the agreements grant Defendant the right to cure breaches of the Settlement Agreement.

### 2. *Whether a Failure to Provide Complete Certifications as Required by § 5.2(c) of the Settlement Agreement Is Curable*

There is no language in § 7.1(i) of the MBL Pledge Agreement excluding any particular breaches from the opportunity to cure. Rather, § 7.1(i) outlines that (1) "any default which can be cured by the payment of a sum of money" must be cured within ten days of written notice, and (2) "any other default" must be cured within thirty days of written notice, "provided, however, that if such non-monetary default under this clause . . . is susceptible of cure but cannot be cured within such thirty (30) day period," the time for cure shall be extended for a period of time reasonably necessary to cure, so long as that period does not exceed ninety days after the original notice. Doc. No. 40-6, Def.'s Ex. 5

§ 7.1(i). Thus, § 7(i) suggests that there are two types of non-monetary defaults --

those that are susceptible to cure (whether within thirty or ninety days of notice),

and those that are not susceptible to cure. And the plain language of § 7.1(i)

provides that "any" non-monetary default is provided the opportunity for cure.

Although the phrase "susceptible to cure" is not defined in any of the

agreements, its meaning is clear enough on its face, *i.e.*, capable of being cured.[8]

Defendant's failure to provide a certification for all "Defendant Parties" that they

complied with § 5.2(b) of the Settlement Agreement appears capable of cure --

Defendant could cure this purported breach by providing a certification for Philip

Gray and Kenwei Chong. And there is no language in *any* of the agreements

excluding from cure breaches of § 5.2 of the Settlement Agreement (much less any

other obligation under the Settlement Documents). Rather, § 7.1(i) allows a party

to cure "any" non-monetary default, and that is exactly what Defendant did.

In opposition, Plaintiff points to the fact that the Settlement

Agreement provides that § 5.2 "is material to this Agreement and has been

---

[8] Based on the list of "events of defaults" enumerated in § 7.1, it appears that some defaults are not capable of being cured. For example, an "event of default" includes "the occurrence of a Transfer that is not a Permitted Transfer," Doc. No. 40-6, Def.'s Ex. 5 § 7.1(c), with "Transfer" being defined as including, among other things, the transfer of any real property or beneficial interest in the company at issue. *Id.* § 15.1. If Defendant made a non-Permitted Transfer, Defendant may not be able to cure the default -- the property transferred would be in the hands of the third party and not within Defendant's control.

necessary to induce Plaintiff Parties to enter this agreement," Doc. No. 40-3, Def.'s

Ex. 2 § 5.2, to argue that Defendant's failure to comply with § 5.2 was a "vital"

and/or "material" breach that cannot be cured.  Doc. No. 71, Pl.'s Reply at 3.

Stringing together caselaw applying contract principles from other states, Plaintiff

argues that where Defendant materially breaches the parties' agreement, Defendant

is not permitted to cure.  The court rejects this argument.

Plaintiff relies on *L.K. Comstock & Co. v. United Engineers &*

*Constructors Inc.*, 880 F.2d 219 (9th Cir. 1989), which held under Arizona law that

a party need not provide the contract's forty-eight hours notice before canceling a

contract where the defaulting party would be unable to cure the default in that

amount of time.  *Id.* at 231-32.  *L.K. Comstock* reasoned that this breach was

"vital," as opposed to "curable," and the notice provision should be interpreted to

apply to only those breaches that could in fact be cured.  *Id.* at 232.  In reaching

this conclusion, *L.K. Comstock* relied on *Olin Corp. v. Central Indus.*, 576 F.2d

642 (5th Cir. 1978), which as *L.K. Comstock* explains, determined that a party may

rescind a contract without giving notice where the other party commits a vital

breach that frustrates the purpose of the contract. *Id.* at 232 (citing commentary on *Olin* by 2 *Corbin on Contracts* § 1266, p. 442 (C. Kaufman supp. 1984)).[9]

This caselaw stands for the unremarkable proposition that where a party commits a non-curable breach, the non-breaching party may terminate the contract without providing the notice outlined in the parties' agreement. This caselaw does not apply here -- Defendant's failure to comply fully with § 5.2 was curable, and in fact cured, within thirty days after Plaintiff's notice.

The court further rejects Plaintiff's suggestion that a party may not cure a material breach as contrary to *4000 Old Pali Road Partners v. Lone Star of Kauai, Inc.*, 10 Haw. App. 162, 163, 862 P.2d 282, 283 (1993), which confirms the common sense notion that material breaches are subject to the notice and cure provisions provided in a contract. Specifically, *4000 Old Pali Road Partners* held under Hawaii law that even where a lessee materially breached a percentage lease by failing to record its sales figures, such breach was subject to the notice and opportunity to cure provided in the lease. *Id.* at 184, 862 P.2d at 292.

In sum, the court finds that a breach of § 5.2 of the Settlement Agreement is subject to the cure provision provided in the MBL Pledge

---

[9] Plaintiff also cites to a number of Hawaii cases in defining when a breach is material. *See* Doc. No. 58, Pl.'s Opp'n at 19-23. These cases, however, do not address when a material breach is curable, and are therefore unhelpful to the court's analysis.

Agreement.  Because it is undisputed that Defendant submitted a certification as to § 5.2(b) by Philip Gray and Kenwei Chong within thirty days of Plaintiff's notice of default, the court GRANTS Defendant's Motion for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment on Plaintiff's claims to the extent based on Defendant's failure to comply with § 5.2 of the Settlement Agreement.

## C.    Failure to Provide Financial Documents

The Complaint asserts that Defendant breached the Mortgage, MBL Pledge Agreement, and Lahaina Pledge Agreement by failing to provide quarterly financial information within twenty days following the end of the third quarter of 2009 (*i.e.*, by October 20, 2009).  Doc. No. 1, Compl. ¶¶ 38-49.  The parties dispute, among other things, whether any breach was curable, and whether Defendant in fact cured such breach.[10]  Based on the following, the court finds no genuine issue of material fact that any breach was subject to cure and in fact cured.

### 1.    *Whether a Breach Is Subject to Cure*

There is no language in any of the agreements suggesting that Defendant's obligation to provide financial information was excluded from the

---

[10]  Because the court finds that the breach was curable and in fact cured, the court need not reach Defendant's argument that it had no obligation to provide financial information for the third quarter of 2009.

cure provisions provided in the agreements. Rather, the agreements expressly define that an "event of default" includes the failure "to deliver to the Mortgagor any of the Financial Statements" (in the case of the Mortgage), Doc. No. 40-5, Def.'s Ex. 4, and/or a "default in the performance of [Defendant's] obligations under this Agreement" (in the case of the Lahaina Pledge Agreement), Doc. No. 40-7, Def.'s Ex. 6, and/or "if Pledgor shall fail to deliver to the Lender any of the Financial Statements" (in the case of the MBL Pledge Agreement). Doc. No. 40-6, Def.'s Ex. 5. Further, failure to provide financial information is capable of being cured by Defendant providing the information. *See also 4000 Old Pali Rd. Partners*, 10 Haw. App. at 186, 862 P.2d at 292.

In opposition, Plaintiff reiterates its argument that material breaches are not curable, and that Defendant's provision of quarterly financial information was a material term of the parties' agreement. As explained above, however, the court finds that the cure provisions apply to both material and non-material breaches. Thus, the court finds that Defendant was entitled to cure any failure to provide quarterly financial information.

## 2. *Whether Defendant Cured the Breach*

It is undisputed that on November 16, 2009 -- within thirty days of Plaintiff's notice of default -- Defendant provided Plaintiff a Profit and Loss

Statement, Cash Flow Statement, and Balance Sheet, together with the rent rolls

and occupancy reports for the Collateral Properties. Doc. No. 40-11, Def.'s Ex. 10.

Plaintiff argues, however, that Defendant's efforts failed to cure the breach because

(1) "the certifications to the financial statements provided by [Defendant] failed to

state whether GAAP or other sound accounting principles were applied;" (2) the

statements did not include an aged accounts receivable report; and (3) the

statements did not include a balance sheet for the Kokua Market Property. Doc.

No. 58, Pl.'s Opp'n at 30-31. Viewed in a light most favorable to Plaintiff, the

evidence fails to support Plaintiff's arguments.

As to Plaintiff's first argument, none of the agreements requires

Defendant to attest that any particular accounting principles were applied. Rather,

the Mortgage provides:

> All financial statements and other documents to be
> delivered pursuant to this Mortgage shall (A) be in form
> and substance acceptable to Mortgagee in Mortgagee's
> reasonable discretion, (B) be prepared in accordance with
> sound accounting principles consistently applied, and (C)
> be certified by Mortgagor as being true, correct, complete
> and accurate in all material respects fairly reflecting the
> results of operations and financial condition of
> Mortgagor for the relevant period, if applicable.

Doc. No. 40-5, Def.'s Ex. 4 § 2.5. The Lahaina Pledge Agreement and MBL

Pledge Agreement contain substantially similar language. Doc. No. 40-6, Def.'s

Ex. 5 § 15.3(e); Doc. No. 40-7, Def.'s Ex. 6 § 15.3(e). Based on this language, the agreements require only that Defendant prepare its financials using sound accounting principles; they do not require Defendant to certify that it did so.[11] The court therefore finds no genuine issue of material fact supporting that Defendant breached such obligation.[12]

As to the aged accounts receivable report, Defendant explains that it had no information to report because, as stated in the balance sheets, Defendant received all rent payments for 2009. *See* Doc. No. 62, Def.'s Reply at 16; Doc. No. 40-11, Def.'s Ex. 10 at TMG000247. In other words, Defendant provided Plaintiff the relevant information -- that there were no aged accounts receivable to report. As a result, the court finds no genuine issue of material fact that Defendant complied with its obligation to provide an aged accounts receivable report.

Finally, as to Plaintiff's assertion that Defendant failed to include a balance sheet for the Kokua Market Property, Plaintiff provided a balance sheet providing information for the Kokua Market Property, the West Maui Center, and

---

[11] Defendant complied with the certification requirement -- Defendant certified that the financial statements provided "are true, correct, complete and accurate in all material respects and fairly represent the results of operations and financial condition of the respective companies . . . ." Doc. No. 40-11, Def.'s Ex. 10.

[12] Plaintiff presented no evidence that the financial statements were not prepared with sound accounting principles, whether by expert or otherwise.

33

the Kaiser Property. This balance sheet included a column for each of these properties, and provided within each of these columns the assets and liabilities for these properies. *See* Doc. No. 40-11, Def.'s Ex. 10. While the columns for the West Maui Center and Kaiser Property were filled in with financial figures, the column for the Kokua Market Property included dashes (*e.g.*, for "total assets" the column provides "-"), apparently denoting that it had no information to provide. *Id.* And Defendant explains that this balance sheet is blank because "[t]he Kokua property has a $0 basis and $0 note liability. All rent received is transferred to [Defendant] and offset by a contra-asset which is eliminated during consolidation." *See* Doc. No. 62, Def.'s Reply at 16. Thus, Defendant provided Plaintiff a balance sheet -- which in fact was accurate -- and Plaintiff comes forward with no evidence showing that the balance sheet was inaccurate. Indeed, consistent with its obligation of good faith and fair dealing, Plaintiff could have asked for more information from Defendant. That Plaintiff chose not to seek an explanation is no basis for breach on Defendant's part. The court therefore GRANTS Defendant's Motion for Summary Judgment on Plaintiff's claims that Defendant breached the agreements by failing to provide quarterly financial information for 2009.

///

///

**D.     Inspection of Records**

The Complaint alleges that Defendant breached its obligation to allow Plaintiff to inspect the property and books, records, and accounts of MBL Maryland, Inc. and Lahaina C, LLC.  Doc. No. 1, Compl. ¶¶ 57-60.  It is undisputed that both the Lahaina Pledge Agreement and MBL Pledge Agreement provide Plaintiff the right to inspect the "books, records and accounts of [the Defendant company] and to make such copies and extracts thereof as [Plaintiff] shall desire, in each case at such reasonable times as may be requested by Lender." *See* Doc. No. 40-6, Def.'s Ex. 5 § 15.2; Doc. No. 40-7, Def.'s Ex. 6 § 15.2.  It is also undisputed that Plaintiff first notified Defendant in a November 13, 2009 letter that it wished to inspect the books during the week of November 30, 2009, and demanded Defendant's confirmation by November 16, 2009.  Doc. No. 40-10, Def.'s Ex. 9 at 5.  In its November 16, 2009 response, Defendant did not reference Plaintiff's request for inspection, Doc. No. 40-11, Def.'s Ex. 10, and Plaintiff did not reiterate this request in its November 19, 2009 letter requesting mediation. Doc. No. 40-12, Def.'s Ex. 11.  Rather, Plaintiff asserted in a December 4, 2009 letter that Defendant's refusal to allow inspection was an event of default under the agreements.  Doc. No. 40-15, Def.'s Ex. 14.  After this December 4, 2009 letter, the record reveals no discussions between the parties regarding curing this alleged

default until the December 30, 2009 mediation.  *See* Doc. No. 40-23, Def.'s Ex. 22 (discussing events of mediation).  The parties ultimately agreed to hold the inspection on February 23, 2010.  Doc. No. 40-25, Def.'s Ex. 24.  The February 23, 2010 inspection is more thirty days after, but within ninety days, of Plaintiff's December 4, 2009 assertion that Defendant had defaulted.

Defendant argues that it is entitled to summary judgment because the parties mutually agreed to the February 23, 2010 inspection date such that Plaintiff cannot now assert that a breach occurred.  Doc. No. 39-1, Def.'s Mot. at 23-24. Defendant further argues that even though February 23, 2010 is more than thirty days after Plaintiff's notice of default, Defendant was entitled to the ninety-day period provided in the cure provision.  *Id.*  In contrast, Plaintiff argues, among other things, that Defendant "refused for months" to allow Plaintiff to inspect the records such that Defendant is not entitled to any extension of the initial thirty-day cure period, and that the cure period ended December 13, 2009.[13]

---

[13]  Plaintiff also argues that Defendant did not make available all records of MBL Maryland, Inc. and Lahaina C, LLC given that Plaintiff received only a "handful" of financial information.  *See* Doc. No. 58, Pl.'s Opp'n at 32; Doc. No. 56-2, Pl.'s Ex. C.  In support of this argument, Plaintiff relies on the Declarations of Rex Fujichaku and S. Craig Tomkins, neither of whom performed the inspection.  As a result, Defendant objects that these Declarations lack personal knowledge and foundation.  *See* Doc. No. 63.  Even if the court accepted this evidence (an issue the court need not resolve), it would only raise the fact issue as to whether the inspection was sufficient.  In light of the other factual questions, the court need not resolve this evidentiary dispute at this time.

These arguments all raise fact questions that cannot be resolved on summary judgment. In particular, it is question of fact whether Defendant defaulted on its obligation to allow inspection where it did not immediately respond to Plaintiff's request. It is also a question of fact whether the parties' conduct extended the cure period to ninety days where it appears that Defendant did not respond to Plaintiff's December 4, 2009 assertion that Defendant was in default until the December 30, 2009 mediation. The court therefore DENIES both Defendant's and Plaintiff's Motion for Summary Judgment on Plaintiff's claim that Defendant breached the Settlement Documents by failing to allow inspection of the records.

## E.  Additional Alleged Breaches Raised by Plaintiff

Plaintiff raises two additional alleged breaches of the Settlement Documents. First, Plaintiff argues that Defendant committed a new breach of § 5.2 of the Settlement Agreement by including in its Motion information contained in the Tanoue Order. *See* Doc. No. 58, Pl.'s Opp'n at 22.[14] Second, at the April 14, 2014 hearing, Plaintiff argued that Defendant breached the Settlement

---

[14]  To the extent the Tanoue Order is a public document, it appears that Defendant would have no obligation to keep it confidential. *See* Doc. No. 40-3, Def.'s Ex. 2 § 5.2 (providing that Defendant Parties must keep the Tanoue Order strictly confidential "except to the extent that such information (i) has already been made public, including the inclusion of the same in pleadings or other materials filed in the [Hawaii Litigation]"). This issue, however, is not properly before the court.

Documents by failing to provide financial information for the second quarter of 2009. Neither of these alleged breaches is pled in the Complaint (and it even appears that Plaintiff had never previously raised with Defendant entitlement to 2009 second quarter information). Because these alleged breaches are not part of Plaintiff's Complaint, they are not part of this action.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment, and DENIES Plaintiff's Motion for Summary Judgment. Remaining are Plaintiff's claims based on Defendant's alleged failures to allow full inspection of the records for Lahaina C, LLC and MBL Maryland, Inc.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 22, 2014.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Reading Int'l, Inc. v. The Malulani Grp.*, Civ. No. 13-00133 JMS-KSC, Order (1) Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, or, in the Alternative, Motion for Partial Summary Judgment, Doc. No. 39; and (2) Denying Plaintiff's Counter-Motion for Summary Judgment, Doc. No. 58