IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| READING INTERNATIONAL, INC., a Nevada corporation, | ) ) | CIV. NO. 13-00133 JMS-KSC |
| | ) | ORDER GRANTING DEFENDANT |
| Plaintiff, | ) | THE MALULANI GROUP, LIMITED'S |
| | ) | RENEWED MOTION FOR PARTIAL |
| vs. | ) | SUMMARY JUDGMENT ON |
| | ) | PLAINTIFF READING |
| THE MALULANI GROUP, | ) | INTERNATIONAL, INC.'S ALLEGED |
| LIMITED, a Hawaii corporation, | ) | BREACH NO. 6, DOC. NO. 133 |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER GRANTING DEFENDANT THE MALULANI GROUP, LIMITED'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF READING INTERNATIONAL, INC.'S ALLEGED BREACH NO. 6, DOC. NO. 133

## I. INTRODUCTION

On March 19, 2013, Plaintiff Reading International, Inc. ("Plaintiff" or "Reading") filed this action alleging several breaches of a settlement agreement by Defendant The Malulani Group, Limited ("Defendant" or "TMG"). On April 22, 2014, the court granted in part Defendant's Motion for Summary Judgment (the "April 22, 2014 Order"). *See Reading Int'l v. The Malulani Grp., Ltd.*, --- F. Supp. 2d ----, 2014 WL 1604344 (D. Haw. Apr. 22, 2014). The April 22, 2014 Order granted summary judgment in favor of Defendant on all but one of Plaintiff's

claims, concluding that -- on the record then before the court -- material questions of fact existed as to Plaintiff's claim that Defendant breached its obligation to allow inspection of records and accounts of MBL Maryland, Inc. and Lahaina C, LLC. *Id.* at \*14. After additional discovery, and rulings on related discovery motions, Defendant was granted leave to file a Renewed Motion for Partial Summary Judgment on the remaining claim. Doc. No. 133. Based on the following, the court GRANTS the renewed Motion.

## II. <u>BACKGROUND</u>

**A.     Factual Background**[1]

###     *1.     Relevant Contractual Provisions*

The parties' disputes stem from a July 2009 settlement that was documented in five agreements. Given the court's conclusions in the April 22, 2014 Order, remaining in this action is whether TMG failed to allow inspection of certain records as required by two agreements: (1) the Shareholder Pledge Agreement dated July 2, 2009, in which TMG granted a security interest in and pledged to Reading all of its right, title, and interest in the shares of MBL Maryland, Inc., whose sole asset is a property known as the West Maui Center

---

[1] The court focuses here on only those facts relevant to the remaining issues. The details of the parties' overall dispute are set forth in the April 22, 2014 Order.

2

("MBL Pledge Agreement"); and (2) the Collateral Assignment of Membership Interests dated July 2, 2009, in which TMG granted a security interest and pledged to Reading all of its right, title, and interest in its membership in Lahaina C, LLC, whose sole asset is a property known as the Kaiser Property ("Lahaina Pledge Agreement").

In particular, both the MBL Pledge Agreement and Lahaina Pledge Agreement give Reading the right to inspect "such books, records and accounts of [MBL Maryland or Lahaina C] and to make such copies and extracts thereof as [Reading] shall desire, in each case at such reasonable times as may be requested by [Reading]," and to do so "at [TMG's] cost and expense if an Event of Default has occurred." Doc. No. 135-5, Def.'s Ex. 4 § 15.2; Doc. No. 135-6, Def.'s Ex. 5 § 15.2.

As explained and interpreted in the April 22, 2014 Order, the MBL Pledge Agreement and the Lahaina Pledge Agreement include default-related clauses. For example, the MBL Pledge Agreement provides:

> 7.1. <u>Definition of Events of Default</u>. Any of the following specified events shall constitute "Events of Default" under this Agreement:
> (a)     the occurrence of the events identified elsewhere in this Agreement or the Loan Documents as constituting an "Event of Default" hereunder or thereunder;
> (b)     subject to subparagraph 7.1(i) below, any breach by a "Defendant Party" (as such term is defined in the

Settlement Agreement) of an obligation of such party under the Settlement Agreement or any other Settlement Document;

. . .

(g)     if [Defendant] shall fail to deliver to [Plainitf] any of the Financial Statements as required pursuant to Section 15.3 hereof;[2]

. . .

(i)     if a default shall be continuing under any of the other obligations, agreements, undertakings, terms, covenants, provisions or conditions of this Agreement, the Lahaina Pledge, Mortgage, Note or any other Loan Document not otherwise referred to in this Section for ten (10) days after notice to [Defendant], in the case of any default which can be cured by the payment of a sum of money or for thirty (30) days after written notice, in the case of any other default (unless otherwise provided herein or in such other Loan Document); provided, however, that if such non-monetary default under this clause (i) is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided

---

[2]  This provision relating to § 15.3 is not included in the Lahaina Pledge Agreement, although the parties do not dispute that violations of duties under § 15.3 in the Lahaina Pledge Agreement would also constitute a default.  Section 15.3 of both the MBL Pledge Agreement and the Lahaina Pledge Agreement provide, in part:

15.3.  Financial and Other Reporting Requirements

(a)  [Defendant] shall keep and maintain or shall cause to be kept and maintained, on a calendar year basis, in accordance with sound accounting principles consistently applied . . . books, records and accounts reflecting in reasonable detail all of the financial affairs of Company and all items of income and expense in connection with the operation of the Company Property.
. . . .
(d) [Defendant] shall furnish to [Plaintiff] within ten (10) Business Days after request, such further reasonable information with respect to the Company and the operation of the Company Property as may be requested by [Plaintiff].

Doc. No. 135-5, Def.'s Ex. 4 at TMG000159; Doc. No. 135-6, Def.'s Ex. 5 at 000191.

> further that [Defendant] shall have commenced to cure
> such default within such thirty (30) day period and
> thereafter diligently and expeditiously proceeds to cure
> the same, such thirty (30) day period shall be extended
> for such time as is reasonably necessary for [Defendant]
> in the exercise of due diligence to cure such default, but
> in no event shall such period exceed ninety (90) days
> after the original notice.

Doc. No. 135-5, Def.'s Ex. 4 § 7.1.

The Lahaina Pledge Agreement and MBL Pledge Agreement also include provisions stating that time is of the essence with respect to the performance of the obligations under these documents. *Id.* § 23(f); Doc. No. 135-6, Def.'s Ex. 5 § 23(f).

### 2. *Reading's Allegations of Default by TMG*

Analyzing Reading's remaining theory of default is best understood by considering the following chronology of events and exchanges of communications between the parties beginning in late 2009 and continuing through 2010 (with additional details set forth when the court analyzes whether there are genuine issues of material fact as to the remaining issue in the case):

On November 13, 2009, Reading delivered to TMG a Notice of Default and Acceleration of Indebtedness ("November 13, 2009 Notice"), invoking several provisions of the settlement agreement and corresponding documents. *See* Doc. No. 135-7, Def.'s Ex. 6. The November 13, 2009 Notice claimed several

distinct Events of Default, *and* (among other demands) elected under § 15.2 of the MBL Pledge and Lahaina Pledge Agreements to inspect certain "books, records and accounts." *Id.* at TMG000239. Reading requested that such inspection occur during the week of November 30, 2009, and asked TMG to "confirm by 5:00 PM (Honolulu Local Time), Monday, November 16, 2009, whether you will cooperate with the inspection." *Id.*

On November 16, 2009, TMG responded to the November 13, 2009 Notice, primarily asserting that there was a misunderstanding regarding when TMG's obligations would begin, explaining that it had believed the obligations would begin on December 31, 2009, and producing certain financial documents. It requested that the November 13, 2009 Notice be withdrawn. It did not, however, specifically mention the request to inspect records under § 15.2. *See* Doc. No. 40-11, Def.'s Ex. 10 (First Mot. Summ. J.).

On November 19, 2009, Reading (through its counsel, Margery Bronster) responded to TMG's November 16, 2009 letter by demanding mediation, stating "Reading is open to mediate this matter and therefore hereby gives TMG notice that Reading demands mediation. Please let me know by Friday, November 20, 2009, when you will be available for mediation." Doc. No. 135-8, Def.'s Ex. 7

at 2.  The letter, however, does not specifically mention the § 15.2 requests for inspection.

TMG responded (through its counsel John ("Jack") Dwyer) on November 20, 2009.  It "disagree[d] with [Reading's] conclusions," asserting that "[t]here simply has been no default under the various Settlement documents as alleged by you."  Doc. No. 135-9, Def.'s Ex. 8.  But TMG agreed that "mediation is appropriate," although its letter also did not specifically mention the § 15.2 inspection requests.

On November 30, 2009, Reading wrote back, noting TMG's disagreement, but stating:

> . . . Pending mediation, we expect that the demands in the [November 13, 2009] Notice . . . be complied with fully.  Any failure by [TMG] or others responsible for executing these actions will constitute additional grounds for relief. . . .
>     Moreover, we reiterate Reading's demand, as set forth in the [November 13, 2009] Notice, for inspection and copying of the books and records of MBL Maryland, Inc. and Lahaina C, LLC.  Reading's rights to access the entities' records is guaranteed by the Closing Documents and is <u>not</u> [dependent] upon whether TMG agrees whether default has occurred.  We repeat Reading's request that the records be made available, preferably during the week of December 7, 2009.  Please verify by Wednesday, December 2, 2009, whether or not a representative of Reading may access the records.

Doc. No. 135-10, Def.'s Ex. 9.

On December 3, 2009, another of Reading's counsel, Rex Fujichaku,

sent an email to Dwyer as follows: "Jack, did you have a chance to follow up with

Easton [Manson, President of TMG] on the possible dates for the TMG mediation?

They were 12/29, 12/30 or 1/5, with a preference for the December dates." Doc.

No. 135-11, Def.'s Ex. 10. On December 4, 2009, Dwyer answered Fujichaku's

email, stating:

> Rex -- Yes, I have been able to confirm that both Easton
> and I will be available on Wednesday, December 30,
> 2009 for mediation. If you could advise [the Mediator]
> of that date and let me know the time, I would appreciate
> it.
> With respect to you[r] letters of November 19 and
> 30, 2009, we of course disagree with your position and
> will defer to the decision of the Mediator regarding the
> production of documents. Jack.

*Id.*

On December 4, 2009, Reading confirmed by letter that "the

mediation of [Reading's] Notice of Default regarding the Settlement Agreement

will be held on December 30, 2009 at 9:00 a.m., in our office. David Fairbanks

will preside as the Mediator." Doc. No. 135-12, Def.'s Ex. 11.

Later on December 4, 2009, Reading sent TMG another letter -- a new

Notice of Default, purportedly based on Dwyer's earlier email of December 4,

2009, wherein he stated that TMG "will defer to the decision of the Mediator

regarding the production of documents."  Specifically, Reading's counsel wrote:

> We write regarding [TMG's] refusal, contained in John
> Dwyer, Jr.'s December 4, 2009, email, of [Reading's]
> request to inspect and copy the books and records of
> MBL Maryland, Inc. ("MBL") and Lahaina C, LLC
> ("Lahaina").
>
> Reading had requested access to the MBL records under
> Section 15.2 of the MBL Pledge Agreement and the
> Lahaina records under Section 15.2 of the Lahaina
> Pledge Agreement in its Notice of Default and
> Acceleration of Indebtedness dated November 13, 2009.
> We had reiterated the request in our letters dated
> November 19 and 30, 2009.
>
> Notice is hereby given that TMG's refusal constitutes
> and Event of Default under Section 7.1(a), (b), and (f) of
> the MBL Pledge Agreement and the Lahaina Pledge
> Agreement, respectively.

Doc. No. 135-13, Def.'s Ex. 12.  The present Motion centers around this December

4, 2009 Notice of Default.

On December 16, 2009, Reading sent yet another Notice of Default to

TMG.  This Notice of Default concerned "Kroll documents" and a "Tanoue Order"

regarding certification of efforts to destroy certain documents, as described in the

April 22, 2014 Order.  Doc. No. 144-3, Pl.'s Ex. A.  TMG's counsel responded to

this latest Notice of Default on December 18, 2009, indicating (after emphasizing

good faith duties in the settlement agreement, and pointing out that "a simple

9

telephone call would have resolved" matters) that he "will be able to provide you with their additional certification."  Doc. No. 135-1, Def.'s Ex. 13.  And on December 21, 2009, TMG provided those additional certifications.  Doc. No. 144-4, Pl.'s Ex. B; *see also* April 22, 2014 Order, 2014 WL 1604344, at *11-12.[3]

On December 30, 2009, the parties met with the Mediator.  The record is unclear as to exactly what was discussed during this mediation session, but the mediation was then recessed or suspended.  *See, e.g.*, Doc. No. 135-29, Def.'s Ex. 28 at 6.  As for the § 15.2 inspection issues, Easton Manson (President of TMG) attests as follows:

> On December 30, 2009, the parties had an initial mediation session at the Mediator's office.  The following persons attended:  the Mediator, Bronster, Fujichaku, Dwyer, and myself.  At the mediation, Bronster did not demand inspection of the West Maui Center or Kaiser Lahaina records, and did not specify any date for inspection.  Instead, at the end of the initial session of the mediation, Bronster represented that she would travel to Los Angeles in January 2010 to meet with Reading's representatives (James Cotter and Craig Tompkins) to discuss, among other things, the issue of records inspection, and would then instruct either the Mediator or Fujichaku to contact Dwyer and/or me about arranging a records inspection, if need be.  Based on that discussion at the initial mediation session, I anticipated

---

[3]  Reading asserts that because TMG immediately complied with this demand, it could also have complied with the request for inspection of MBL Maryland and Lahaina C records, rather than "refusing" by "deferring" to the Mediator.  But -- unlike with the inspection issue -- there is no possibility that this December 16, 2009 request was part of the upcoming mediation.

> hearing in January 2010 from Bronster, Fujichaku and/or
> the Mediator regarding inspection.

Doc. No. 135-1, Manson Decl. ¶ 15.  Dwyer submitted a similar declaration, also

attesting that

> at the conclusion of the mediation, Bronster represented
> that she would travel to Los Angeles in January 2010 to
> meet with Reading's representatives, James Cotter and
> Craig Tompkins, to discuss, among other things, the issue
> of a records inspection, and would then instruct either
> Fairbanks or Fujichaku to contact Manson and/or me
> about arranging a records inspection, if need be.

Doc. No. 135-33, Dwyer Decl. ¶ 12.  Both Dwyer and Manson attest that, from

December 31, 2009 to February 1, 2010, they did not receive any communication

from Reading (or Bronster or Fujichaku) about the inspection.  *Id.* ¶ 13; Doc. No.

135-1, Manson Decl. ¶ 16.

On February 2, 2010, Reading wrote to TMG, declaring another

Notice of Default -- this one concerning TMG's alleged breach of its obligation to

provide certain quarterly financial statements (also analyzed in the April 22, 2014

Order).  Doc. No. 135-15, Def.'s Ex. 14.  The letter ended by stating (referring to

the § 15.2 request for inspection): "[l]astly, please inform us when we may inspect

Lahaina and MBL's books and records."  *Id.*  That same day, Dwyer's secretary

responded with a letter indicating that Dwyer was out of the country in a "beautiful

but primitive" area of the Philippines, and "absolutely cannot be reached unless he

calls the office." Doc. No. 135-16, Def.'s Ex. 15. She advised that Dwyer would address Reading's letter when he returns to the office after February 12, 2010. *Id.*

On February 16, 2010, Reading again wrote to TMG, stating "[w]e write to see if any response is forthcoming to our letter to you dated February 2, 2010, regarding the notice of default. . . . We would also like to proceed with the inspection of the Lahaina C, LLC and MBL Maryland, Inc. records on either February 17 or 18, 2010. Please inform us which date is preferable." Doc. No. 135-17, Def.'s Ex. 16.

TMG responded later that day. In TMG's letter, among other matters, Dwyer reviewed certain events from the December 30, 2009 mediation session, explaining that:

> At the conclusion of that session it was my understanding, as communicated by the Mediator, that you would be traveling to Los Angeles to meet with your client (Mr. James Cotter of [Reading]) and Craig Tompkins. That meeting was to provide you guidance so that we could reconvene in mediation on your return. Additionally, the Mediator indicated that in your absence, your associate, Rex Fujichaku[,] would arrange to review the property documents relating to the collateralized properties, as they were available.
> To date, except for your new alleged default letter, we have heard nothing from you since your trip to Los Angeles; and surprisingly no one has even contacted Mr. Manson or me regarding the review of the documents.

Doc. No. 135-18, Def.'s Ex. 17.

On February 18, 2010, Reading wrote back to TMG, disputing some

of its assertions, and reiterating Reading's request to inspect records of MBL

Maryland and Lahaina C:

> [Y]ou are factually wrong in asserting that we had not
> contacted you or Mr. Manson regarding the review of the
> documents since February 16. In closing our February 2
> letter to you, we clearly said, "Lastly, please inform us
> when we may inspect Lahaina and MBL's books and
> records." We reiterated our request in correspondence
> we sent to you on February 16, 2010.
> We would like to inspect the books and records on
> Monday, February 22, 2010 at 10 a.m. . . . Please ensure
> that all of the books and records are available for review
> at that time.

Doc. No. 135-19, Def.'s Ex. 18.

TMG responded the next day. By letter dated February 19, 2010,

Dwyer again emphasized his understanding that he had been waiting to hear from

Reading, based on representations made at the December 30, 2009 mediation

session:

> . . . [M]y "assertion" referred to both of your
> commitments made at the Mediation . . . (a) that you
> would contact us (perhaps through the Mediator) upon
> your return from meetings in Los Angeles with Messrs.
> Cotter and Tompkins to discuss the issues raised during
> the Mediation, and (b) you would have your associate,
> Rex Fujichaku, contact us regarding a review of the
> appropriate documents.
> . . . So let me state it very clearly -- it was and
> continues to be a fact (as stated in my February 16, 2010

> letter) that neither you nor Mr. Fujichaku contacted Mr.
> Manson or me from the date of the Mediation, <u>December
> 30, 2009</u>, until we received your new Default letter of
> February 2, 2010.

Doc. No. 135-20, Def.'s Ex. 19.  Dwyer then offered February 23, 2010 as a date

for the inspection of records.  *Id.* at TMG000349.

On February 22, 2010, Fujichaku and Dwyer exchanged emails

regarding the records inspection.  In particular, Fujichaku asked, "Can you

represent that all of the books and records will be made available?  Can you tell us

what will be provided tomorrow?"  Doc. No. 135-21, Def.'s Ex. 20.  Dwyer

responded: "Rex -- See you at 10am.  I will have the documents for all 3

properties.  Aloha, Jack."  *Id.*

The inspection occurred on February 23, 2010.  According to Manson,

TMG produced "all then-existing books and records of MBL Maryland, Inc. (and

its sole asset West Maui Center) and Lahaina C, LLC (and its sole asset Kaiser

Lahaina)."  Doc. No. 135-1, Manson Decl. ¶ 25.  Manson attests that he "did not

withhold any documents requested by Reading."  *Id.*  He also produced for

inspection "all then-existing books and records for the Kokua Market," although

those documents were not formally requested.  *Id.*  He states:

> I compiled all business files for the West Maui Center,
> Kaiser Lahaina and Kokua Market from file drawers
> located at my office where all such documents resided,

placed all documents in six boxes . . . and delivered the
boxes of documents to Jack Dwyer's law firm, which
placed all such documents in a conference room for
review by Reading's representative, Duane Seabolt, on
February 23, 2010.  In total, TMG produced 3,837 pages
of documents for inspection.  No one from Reading other
than Seabolt inspected the documents.

*Id.* ¶ 26.  According to Manson, "Seabolt did not request any additional documents

at the inspection, did not [ask] any questions regarding the documents produced at

the inspection, and did not request copies of any of the documents[.]"  *Id.* ¶ 27.

In response, Reading contends generally that the documents were

deficient.  Specifically, Tompkins attests

TMG did not provide all of the financials and
accountings that would have been necessary to form a
complete understanding of the Collateralized Properties.
For example, the financial statements Reading received
from TMG reflected intercompany transfers which could
not be fully understood without the related parent
company financials to put the subsidiary transfers into
context.

Doc. No. 144-1, Tompkins Decl. ¶ 10.

After the February 23, 2010 inspection, Reading did not communicate

with TMG regarding the documents produced until an April 8, 2010 letter to the

Mediator (made available to TMG on June 25, 2010).  Doc. No. 135-1, Manson

Decl. ¶¶ 28-29.  In that letter, Reading wrote "to address the Reading-TMG

mediation which has been recessed."  Doc. No. 135-22, Def.'s Ex. 21.  Among

other matters, Reading asserted that "this review [of February 23, 2010] did not answer the many questions raised by the financials produced by TMG. Moreover, the first quarter 2010 financial statements for the three properties we received through your office on April 5, 2010, contain the same deficiencies as the fourth quarter 2009 statements." *Id.*

The mediation continued from April to October 2010, with the parties exchanging various correspondence with each other, and with the Mediator. *See, e.g.*, Doc. Nos. 135-23 to 135-30, Def.'s Exs. 22-29. Among other exchanges, TMG offered to allow Reading again to review and inspect the books and records of the MBL Maryland and Lahaina C properties (at Reading's expense), and in October 2010, Reading eventually copied the documents for those properties. Doc. No. 135-1, Manson Decl. ¶ 35. Manson attests:

> [T]he documents copied by Reading may include additional documents received or generated in the normal course of business for the three mortgaged properties following the February 23, 2010 inspection. As with the documents made available for inspection on February 23, 2010, TMG produced all documents concerning those businesses and properties; and, conversely, did not withhold any of the books and records for those businesses and properties.

*Id.*

The Mediator formally terminated the mediation on October 26, 2010. Doc. No. 135-30, Def.'s Ex. 29. Reading instituted this action on March 19, 2013. Doc. No. 1.

## B.    Procedural History

After the court's April 22, 2014 Order, Magistrate Judge Chang ordered Plaintiff on May 23, 2014 to supplement (for the second time) its response to Defendant's "interrogatory no. 2" based upon insufficient or conclusory answers. Doc. No. 118, Order at 6. On June 24, 2014, Magistrate Judge Chang granted Defendant's Ex Parte Motion to Further Amend Scheduling Order to Facilitate Renewed Motion for Summary Judgment on Remaining Inspection Breach Issue, Doc. No. 132, which allowed Defendant to file a renewed motion for summary judgment. Accordingly, Defendant filed its "Renewed Motion for Partial Summary Judgment on Plaintiff's Alleged Breach No. 6" on June 27, 2014. Doc. No. 133. Plaintiff filed an Opposition on July 14, 2014, Doc. No. 143, and Defendant filed a Reply on July 12, 2014. Doc. No. 148. A hearing was held on August 4, 2014.

## III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

## IV. ANALYSIS

TMG asserts three grounds for granting its Motion. First, it argues that there was no initial breach under § 15.2, and thus the December 4, 2009 Notice of Default was invalid. Second, even if the Notice was warranted, TMG cured the default by allowing a timely inspection. And third, its cure was effective because it produced everything that was required. The court addresses each ground in turn.

///

///

///

**A.  A Genuine Issue of Material Fact Exists as to Whether the Parties Intended, Before December 4, 2009, to Mediate the § 15.2 Inspection Issues**

TMG seeks summary judgment, arguing that the record is undisputed that it never defaulted on Reading's demand under § 15.2 to inspect the relevant documents of MBL Maryland and Lahaina C.  Instead, it contends that the parties agreed to mediate the issue of inspection (among other issues), and that therefore Reading's December 4, 2009 Notice of Default was improper.  The court concludes, however, that a genuine dispute of fact exists as to this narrow question.

TMG contends that when Reading demanded mediation on November 19, 2009 (and when TMG agreed on November 20, 2009 that "mediation is appropriate"), it was then undisputed that the parties agreed that the subsequent mediation would concern all of the issues raised in Reading's November 13, 2009 Notice of Default.  *See* Doc. No. 133-1, Mot. at 8.  That is, it believes, notwithstanding Reading's November 30, 2009 letter, that "Reading demanded mediation of all claims and rights asserted in its November 13, 2009 'notice of default,' including the inspection demand."  *Id.*

But Reading disagrees.  It points out that the November 13, 2009 Notice of Default formally notified TMG of several other defaults, and that the § 15.2 inspection request was a distinct demand based upon the other defaults.  *See*

Doc. No. 135-7, Def.'s Ex. 6 at TMG000238-09 ("*In addition*, please be on notice that Reading hereby makes the following elections and takes the following actions: . . . Under Section 15.2 of the MBL Pledge Agreement, Reading hereby elects . . .") (emphasis added).  It reiterated this distinction in its letter of November 30, 2009.  *See* Doc. No. 135-10, Def.'s Ex. 9 ("*Moreover*, we reiterate Reading's demand . . . for inspection and copying of books and records of MBL Maryland, Inc. and Lahaina C, LLC.") (emphasis added).  According to Reading, its "November 19, 2009 letter to TMG demanded mediation related to the events of default discussed in its November 13, 2009 notice.  It did not include mediation for Reading's request for inspection, which was still pending."  Doc. No. 144-1, Tompkins Decl. ¶ 6.  Thus, under Reading's theory, when Dwyer "deferred" the inspection issue to the Mediator, he did so unilaterally.  Under its theory, Reading's corresponding December 4, 2009 Notice of Default was a separate issue from the alleged defaults set forth in the November 13, 2009 Notice of Default, and was necessary to trigger time periods under the settlement documents.

Given the evidence before the court, either TMG's or Reading's interpretation is plausible -- indeed, it's possible that no meeting of the minds had occurred as to the exact topics of the mediation (at least as of December 4, 2009).  A question of fact exists as to whether the parties intended (prior to December 4,

2009) to mediate the § 15.2 inspection issues.[4]  And so there is a genuine issue of

material fact whether Reading's December 4, 2009 Notice of Default was

improper.

**B.     It Is Undisputed That, Even If There Was a Default on December 4, 2009, TMG Cured It**

Nevertheless, even assuming that TMG had defaulted as to the

inspection of the MBL Maryland and Lahaina C documents (by not allowing

inspection within a reasonable time from November 13, 2009, and refusing

inspection by "deferring" to the Mediator on December 4, 2009), it is undisputed

that TMG ultimately cured any such default under the terms of the settlement

documents.

*1.     TMG Complied With the Contractual Terms*

Under § 7.1(i) of the MBL Pledge Agreement (and under § 7.1(h) of

the Lahaina Pledge Agreement), the alleged failure to comply with § 15.2 was a

"non monetary default" that was "susceptible of cure."  *See* Doc. Nos. 135-5,

Def.'s Ex. 4 at TMG000154-55; 135-6, Def.'s Ex. 5 at TMG000186-87.  That is,

under the terms of §§ 7.1(h) and (i), the default could not "be cured by the payment

---

[4]  Whether the parties *subsequently* agreed to mediate the § 15.2 inspection issue, and did in fact mediate the issue, are different questions, addressed below.

of a sum or money." *Id*. Accordingly, TMG had thirty days after being given

written notice to cure. *See Reading Int'l*, 2014 WL 1604344, at *8.

Sections 7.1(h) and (i) both further provide that the cure period can be

extended to ninety days:

> if such non-monetary default under this clause [(h) or] (i)
> is susceptible of cure but cannot reasonably be cured
> within such thirty (30) day period and provided further
> that [Defendant] shall have commenced to cure such
> default within such thirty (30) day period and thereafter
> diligently and expeditiously proceeds to cure the same,
> such thirty (30) day period shall be extended for such
> time as is reasonably necessary for [Defendant] in the
> exercise of due diligence to cure such default, but in no
> event shall such period exceed ninety (90) days after the
> original notice.

Doc. No. 135-5, Def.'s Ex. 4 at TMG000154-55; 135-6, Def.'s Ex. 5 at

TMG000186-87.

Given the undisputed evidence before the court, TMG "commenced to

cure" the default within thirty days from December 4, 2009. As both Manson and

Dwyer attest -- even if the parties had not *previously* agreed to mediate the

inspection issue -- the parties did in fact discuss the issue of records inspection in

some manner with the Mediator during or after the mediation session on December

30, 2009. *See* Doc. No. 135-1, Manson Decl. ¶ 15; Doc. No. 135-33, Dwyer Decl.

¶ 12. It is undisputed that, on December 30, 2009, "Bronster represented she

would travel to Los Angeles in January 2010 to meet with Reading's

representatives . . . to discuss, among other things, the issue of records inspection,

and would then instruct either the Mediator or Fujichaku to contact Dwyer and/or

[Manson] about arranging a records inspection[.]"  Doc. No. 135-1, Manson Decl.

¶ 15.[5]

      At that point -- shortly prior to expiration of the thirty-day period -- it

was then not reasonably possible (nor would it reasonably have been expected) for

TMG to proceed with allowing inspection of the MBL Maryland and Lahaina C

books and records, at least until Reading contacted TMG in some manner.  That is,

it is undisputed that the ball was in Reading's court.  And the evidence is also

undisputed that, once Reading did again contact TMG about the inspection (in

February 2010), TMG did not delay -- that is, under the language of § 7.1, TMG

"diligently and expeditiously proceed[ed] to cure" by allowing Reading to inspect

the books and records on February 23, 2010 (which was a date agreed to by both

---

[5] It is also undisputed that the parties continued to discuss the § 15.2 inspection via the
Mediator throughout 2010.  *See, e.g.*, Doc. Nos. 135-22, 135-23, 135-25, 135-26, & 135-28,
Def.'s Exs. 21, 22, 24, 25 & 27.  Indeed, if the § 15.2 inspection issue has not been mediated,
then it is improperly before the court, given § 8.21 of the settlement agreement.  *See* Doc. No.
135-2, Def.'s Ex. 1 at 18 ("The Parties agree to, and shall mediate any and all disputes or claims
arising out of this Agreement and/or any of the Closing Documents. . . .  None of the parties may
initiate any action or proceeding . . . to address any disputes or claims . . . without first having
complied with the foregoing.").  For purposes of summary judgment and construing any disputes
of fact in favor of the non-moving party, the court presumes that the mediation prerequisite has
been satisfied.

parties).  And February 23, 2010 was within ninety days of the December 4, 2009

Notice of Default, *i.e.*, the alleged default was cured within "such time as is

reasonably necessary . . . in the exercise of due diligence" and did not exceed

ninety days.

### 2. *Evidence of Bronster's Statements Is Admissible*

Reading does not provide any evidence contradicting that Bronster

represented to TMG on December 30, 2009 that Reading would contact TMG with

further information regarding the § 15.2 inspection of books and records.[6]  Rather,

Reading objects to the evidence as inadmissible, contending that "[a]ny discussions

that took place during the mediation are protected by the mediation privilege under

---

[6] Even if there were some dispute about exactly what Bronster might have said on December 30, 2009 to TMG or to the Mediator, it is nevertheless undisputed that she represented that Reading would give TMG additional information regarding how and when the inspection might occur, if necessary, after her trip to Los Angeles in January 2010 to discuss matters with Reading's principals.  At minimum, the uncontested evidence establishes that Reading's representation, and TMG's reasonable reliance upon that representation, estops Reading from now asserting that TMG did not cure under both Pledge Agreements.  *See, e.g.*, *Doherty v. Hartford Ins. Grp.*, 58 Haw. 570, 573, 574 P.2d 132, 134-35 (1978) ("One invoking equitable estoppel must show that he or she has detrimentally relied on the representation or conduct of the person sought to be estopped, and that such reliance was reasonable.") (citations omitted); *Zane v. Liberty Mut. Fire Ins. Co.*, 115 Haw. 60, 70, 165 P.3d 961, 971 (2007) (describing the elements of equitable estoppel as (1) an "affirmative representation or conduct," (2) detrimental reliance "upon that affirmative representation or conduct," and "such reliance was reasonable"); *Murphy v. Hood*, 276 F.3d 475, 477 (9th Cir. 2001) ("The elements of equitable estoppel are that (1) the party to be estopped knows the facts, (2) he or she intends that his or her conduct will be acted on or must so act that the party invoking estoppel has a right to believe it is so intended, (3) the party invoking estoppel must be ignorant of the true facts, and (4) he or she must detrimentally rely on the former's conduct.") (citation omitted).

the Hawaii Uniform Mediation Act, [Federal Rule of Evidence ("FRE")] 408 and

other law." Doc. No. 144, Pl.'s Responsive CSF ¶ 15.[7] The court disagrees.[8]

> a.    *The Hawaii Mediation Act ("the Act") does not apply*

Reading first argues that Hawaii Revised Statutes ("HRS") § 658H-4

of the Act protects Bronster's December 30, 2009 communications. Section 658H-

4(a) provides "[e]xcept as provided in section 658H-6 [which does not apply], a

mediation communication is privileged as provided in subsection (b) and is not

subject to discovery or admissible in evidence in a proceeding unless waived or

precluded as provided by section 658H-5."[9] In turn, a "mediation communication"

is defined broadly as "a statement, whether oral, in a record, verbal, or nonverbal,

that occurs during a mediation or is made for purposes of considering, conducting,

participating in, initiating, continuing, or reconvening a mediation or retaining a

mediator." HRS § 658H-2.

---

[7] Craig Tompkins (who is now "a legal consultant" to Reading, and previously "served as Reading's Executive Vice President, Director of Business Affairs, Chief Legal Officer and Corporate Secretary," Doc. No. 144-1, Tompkins Decl. ¶ 2) states that Reading "does not waive the mediation privilege or any other applicable privilege relating to the December 30, 2009, mediation between Reading and TMG." *Id.* ¶ 3.

[8] Reading also argues that Bronster's statements in Dwyer's and Manson's Declarations are hearsay. The statements, however, are non-hearsay admissions of a party-opponent under Federal Rule of Evidence 801(d)(2).

[9] Section 658H-4(b)(1) provides that "A mediation party may refuse to disclose and may prevent any other person from disclosing a mediation communication."

But the entire Act does not apply to Bronster's communications.  It was enacted in 2013, and became effective on July 1, 2013.  *See* 2013 Haw. Sess. L. Act 284, § 2 ("This Act shall take effect on July 1, 2013.").  As for the Act's application to existing mediation agreements (agreements made prior to July 1, 2013), the Act provides:

> (a) This chapter shall govern a mediation pursuant to a referral for mediation or an agreement to mediate made on or after July 1, 2013.
>
> (b) On or after January 1, 2014, this chapter shall govern an agreement to mediate whenever made.

HRS § 658H-13.  It is undisputed that the mediation at issue here is based on an agreement to mediate in a July 2009 settlement -- thus, § 658H-13(a) bars the Act's application unless another provision applies.  And although, under § 658H-13(b), the Act could apply to a mediation between the parties (based on a July 2009 agreement) occurring after January 1, 2014, it is also obvious that the mediation at issue occurred nearly four years ago, in late-2009 and 2010.

Legislative history confirms this conclusion.  The Act was based on the Uniform Mediation Act, drafted by the National Conference of Commissioners on Uniform State Laws, and must be interpreted consistently with that uniform law.  *See, e.g.*, Sen. Stand. Comm. Rep. No. 548 (S.B. No. 966), 2013 Senate J. ("The purpose and intent of this measure is to adopt the Uniform Mediation Act

27

that provides a comprehensive law for privileges and confidentiality in mediation."); HRS § 1-24 ("All provisions of uniform acts adopted by the State shall be so interpreted and construed as to effectuate their general purpose to make uniform the laws of the states and territories which enact them.").  In this regard, HRS § 658H-13 is identical to § 17 of the Uniform Mediation Act.  And the drafters' comment to § 17 of the Uniform Mediation Act provides:

> Section 17 is designed to avert unfair surprise, *by setting dates that will make it likely that the mediation participants took the Act into account in setting up the mediation.*  Subsection (a) precludes application of the Act to mediations pursuant to pre-effective date referral or agreement on the assumption that most of those making these referrals or agreements did not take into account the changes in law.  If parties to these mediations seek to be covered by the Act, they can sign a new agreement to mediate on or after the effective date of the Act.
>
> Subsection (b) is based on the assumption that persons involved in mediation are likely to know about the Act and would therefore be more surprised by the non-application of the Act than the application of the Act after that point.  Each legislature can specify a year or another likely period for dissemination of the news among those involved in mediation.

Unif. Med. Act § 17 cmt., 7A U.L.A.156 (2006) (emphasis added).

This commentary explains that § 658H-13 concerns the dates of the mediation *agreements*, describing when the Act's provisions apply to a mediation (based on an older agreement) that occurs after the Act's effective date.

28

Section 658H-13(b)'s reference to "on or after January 1, 2014" does not mean that the Act applies retroactively to all past mediations. This reading is consistent with HRS § 1-3, which mandates that "[n]o law has any retrospective operation, unless otherwise expressed or obviously intended." *Cf. United Public Workers v. Dawson Int'l, Inc.*, 113 Haw. 127, 144, 149 P.3d 495, 512 (2006) (interpreting similar language "after June 30, 2004, this chapter governs an agreement to arbitrate whenever made" in the Hawaii Uniform Arbitration Act, and concluding that "it does not apply to an ongoing arbitration proceeding, but to arbitration proceedings commenced after June 30, 2004").[10]

---

[10] Reading argues that the Act applies because the court is deciding (at least in part) whether Reading waived a mediation privilege after January 1, 2014. But the question is whether communications from 2009 and 2010 are privileged *under the Act* in the first place. In any event, even if the Act applies, Reading would be precluded from asserting a mediation privilege under HRS § 658H-5(b), which provides:

> A person who discloses or *makes a representation about a mediation communication that prejudices another person* in a proceeding is precluded from asserting a privilege under section 658H-4, but only to the extent necessary for the person prejudiced to respond to the representation or disclosure.

(Emphasis added).

Section 658H-5(b) is identical to § 5(b) of the Uniform Mediation Act, and in addressing waiver and preclusion, the drafters of the Uniform Mediation Act:

> added Section 5(b) [as] a preclusion provision to cover situations in which the parties do not expressly waive the privilege but *engage in conduct inconsistent with the assertions of the privilege, and that causes prejudice.*
> . . .

(continued...)

### b. The statements are admissible under FRE 408(b)

Reading next invokes FRE 408 in arguing that evidence is

inadmissible regarding representation made by Bronster at the December 30, 2009

mediation session.  Rule 408(a) provides:

> Prohibited Uses.  Evidence of the following is not
> admissible -- on behalf of any party -- either to prove or

---

[10](...continued)
>        Critically, the preclusion provision applies only if the
> disclosure prejudices another in a proceeding. . . .  [It] would
> include disclosure that would, *absent the exception, allow one
> party to take unfair advantage of the privilege*.

Unif. Med. Act § 5 cmt., 7A U.L.A. 123 (2006) (emphases added).
        Here, Reading clearly made several "representation[s] about a mediation communication
that prejudices" TMG if it is not allowed to respond.  Reading "engage[d] in conduct
inconsistent with the assertions of the privilege" and caused prejudice to TMG.  *See, e.g.*, Doc.
No. 93, Tr. (Apr. 18, 2014) at 38 (Bronster arguing to the court that "[w]e do not believe that
there was anything in the cure provision that enabled them to toll curing during the pendency of
a mediation.  That's not how the mediation was set up, nor was it discussed."); *id.* at 41 ("So
contrary to them waiting for us, we were waiting for them."); *id*. at 43 (". . . so December all the
way to January [2010], we're waiting, we get nowhere."); *id*. at 43-44 (quoting from Dwyer's
February 16, 2010 letter and asserting that "while we did attempt to [arrange for inspection], we
did not get any response from [TMG]"); *id.* at 44 ("[Dwyer] simply shuts things down. . . .  He
simply rejects my arguments in my February 2, letter out of hand[.]"); Doc. No. 144-1,
Tompkins Decl. ¶ 8 ("At no time did Reading agree to extend the time of performance of TMG's
obligation to allow the inspection of records."). Similarly, Reading did not object on mediation
privilege grounds to other correspondence regarding the mediation, both between themselves and
with the Mediator from 2010.  *See, e.g.*, Doc. No. 135-22, Def.'s Ex. 21; Doc. No. 135-23, Def.'s
Ex. 22; Doc. No. 144-8, Pl.'s Ex. F.
        Essentially, Reading has put statements made during the December 30, 2009 mediation
session at issue, thus precluding it from asserting a privilege.  *Cf. Bittaker v. Woodford*, 331 F.3d
715, 719 (9th Cir. 2003) ("The privilege may be found to have been waived by implication when
a party takes a position in litigation that makes it unfair to protect that party's attorney-client
communications.") (quoting 3 *Weinstein's Federal Evidence* § 503.41[1] (2d ed. 2003) (en
banc); *id.* ("[P]arties in litigation may not abuse the privilege by asserting claims the opposing
party cannot adequately dispute unless it has access to the privileged materials.").

> disprove the validity or amount of a disputed claim or to
> impeach by a prior inconsistent statement or a
> contradiction:
> . . .
> (2) conduct or a statement made during compromise
> negotiations about the claim -- except when offered in a
> criminal case and when the negotiations related to a
> claim by a public office in the exercise of its regulatory,
> investigative, or enforcement authority.

FRE 408(a)(2).  Rule 408(b), however, sets forth exceptions "for another purpose,

such as proving a witness's bias or prejudice, negating a contention of undue delay,

or proving an effort to obstruct a criminal investigation or prosecution."

The evidence -- that Bronster represented that she would travel to Los

Angeles in January 2010 to meet with Reading's representatives and then instruct

either the Mediator or Fujichaku to contact Dwyer or Manson about arranging a

records inspection -- fits squarely within Rule 408(b)'s exception of "negating a

contention of undue delay."  Reading is asserting that TMG improperly delayed

complying with its § 15.2 inspection obligations, and the evidence is being offered

to negate that contention.  *See, e.g.*, *Freidus v. First Nat'l Bank of Council Bluffs*,

928 F.2d 793, 795 (8th Cir. 1991) (applying Rule 408(b)'s exception for negating a

contention of undue delay, reasoning that "the letters served to rebut . . . testimony

that 'even up to this date' the bank had failed to give any reasons for the conditions

it had imposed on giving its consent, testimony that left unrebutted would have

been devastating to the bank's position that it had not unduly delayed giving its consent").

The evidence is also admissible "for another purpose" -- to prove estoppel (that is, to show Reading made a representation upon which TMG relied). *See Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 484 (7th Cir. 2000) ("[I]t would be an abuse of Rule 408 to let Bankcard lull Universal into breaching the contract and then prevent Universal from explaining its actions because the lulling took place around the settlement table. . . . To use Rule 408 to block evidence that the violation of the contract was invited would be unfair."); *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109, 115 (2d Cir. 2008) ("To construe Rule 408 as barring such evidence would substantially limit the opportunity of defendants to rely on the defense of estoppel[.]").

Accordingly, there is no genuine issue of material fact that TMG complied with § 7.1's cure provisions in a timely manner.

### 3. TMG Allowed Inspection of All Books and Records of Lahaina C and MBL Maryland, as Required by § 15.2

Finally, the record is undisputed that TMG fully complied with the § 15.2 request by allowing a complete inspection of the "books, records and accounts of [MBL Maryland and Lahaina C]." Doc. No. 135-6, Def.'s Ex. 5 at TMG000191. In particular, Manson attests several times that he produced a

complete set of "all then-existing books and records" of those entities and "did not withhold" any documents requested by Reading (both on February 23, 2010, and later in October 2010). Doc. No. 135-1, Manson Decl. ¶¶ 25, 26, 39. Manson explains that the deficiencies identified by Reading (in its Third Supplemental Response to Interrogatory Number 2) regard documents that were not in existence in July 2009, when the settlement agreement and related documents created the obligation to allow inspection. *Id.* ¶ 37. He further explains that the properties

> did not have stand-alone financial statements prior to the
> July 2009 settlement because they were single-tenant
> properties and all TMG required to keep track of the
> properties were the lease payments for each tenant and
> the mortgage payments on such properties. . . . Since the
> accounting was simple, the financial entries for the
> properties were tracked in QuickBooks on a consolidated
> basis at the parent company level (TMG). It was not
> until the settlement with Reading in July 2009 that TMG
> started to create stand-alone quarterly financial
> statements for the collateralized properties. These stand-
> alone quarterly financial statements were provided to
> Reading on November 16, 2009 and January 13, 2010
> prior to the February 23, 2010 inspection.

*Id.* ¶ 38. Manson then details the documents that he produced for inspection, including accounting statements, balance sheets, income statements, rent rolls, cash flow statements, rent checks, deposit slips, lease documents, appraisal documents, mortgage documents, title documents, environmental documents, tax documents, and insurance documents. *Id.* ¶ 39.

Reading offers little, other than argument, to contradict Manson's detailed assertions regarding the inspection. The only evidence it proffers is a declaration of Craig Tompkins stating, in a conclusory fashion, that "TMG did not provide all of the financials and accountings that would have been necessary to form a complete understanding of the Collateralized Properties." Doc. No. 144-1, Tompkins Decl. ¶ 10. But this does not contradict the detailed evidence that TMG timely produced all the financial books and records actually possessed by MBL Maryland and Lahaina C as of February 23, 2010. Similarly, Tompkins' more specific assertion that "the financial statements Reading received from TMG reflected intercompany transfers which could not be fully understood without the related parent company financials to put the subsidiary transfers into context," does not dispute that TMG fulfilled its duties under § 15.2 to produce for inspection the "books, records and accounts" of the two companies.[11]

---

[11] In this regard, Tompkins' Declaration also fails to create a material dispute of fact because Tompkins fails to establish the necessary foundation for the court to credit any assertion that documents were withheld. It is undisputed that Seabolt was the only representative of Reading to inspect the records, that Seabolt did not ask any questions of TMG at the inspection about the records, and that he did not ask that any of the records be copied. Nowhere does Tompkins indicate that he reviewed copies of any of the records after October 2010 (when copies were again made available), that he reviewed any reports of the contents of the records, that he discussed the contents of the records with anyone, or that he is even aware of the contents of the records that were produced.

The record is undisputed that, in 2010 after the February inspection, Reading did not assert that TMG failed to produce any records of the two entities in the relevant time frame -- it only asserted to the Mediator in April 2010 that "this review did not answer the many questions raised by the financials produced by TMG." Doc. No. 135-22, Def.'s Ex. 21. Likewise, Tompkins' Declaration, at best, questions the nature of the documents, and not the inspection itself -- at most, an issue under § 15.3 (the requirement to keep and maintain certain records), but not under § 15.2 (the requirement to permit inspection).[12]

Reading also argues (again, without proffering any of its own evidence) that TMG failed to produce "QuickBooks" records from TMG regarding

_____

[12]  Such an alleged violation of § 15.3 is not (given the record before the court), the subject of a Notice of Default, has not been mediated, and is not part of this lawsuit. More important, it is not part of the December 4, 2009 Notice of Default at issue with Defendant's alleged "Sixth Alleged Breach."

Separately, the Complaint alleges a violation of § 15.3(b) because TMG allegedly failed to furnish for MBL Maryland and Lahaina C by October 20, 2009 "a statement of operations (profit and loss), a statement of cash flows, a calculation of net operating income, a balance sheet, an aged accounts receivable report and such other information or reports as requested by Reading." Doc. No. 1, Compl. ¶¶ 44, 47. This claim is included in Plaintiff's "Fifth Alleged Breach," which the court has already rejected in the April 22, 2014 Order. *See* Doc. No. 39-1, Def.'s Mot. at 18-19 (defining the "Fifth Alleged Breach"); Doc. No. 96, Apr. 22, 2014 Order at 32-33, 2014 WL 1604344, at *12-13 (rejecting Plaintiff's arguments as to TMG's alleged failure to provide financial information within twenty days following the end of the third quarter of 2009, October 20, 2009). In the previous Motion, the court addressed Plaintiff's specific arguments as to the § 15.3 claim in the Complaint, and Plaintiff did not contend that its § 15.3 claim encompassed the February 23, 2010 inspection. The only remaining claim in this action is TMG's "Sixth Alleged Breach," which is limited to alleged breaches of § 15.2 of the MBL Pledge Agreement and Lahaina Pledge Agreement. *See* Doc. Nos. 39-1, Def.'s Mot. at 22-23 (defining the "Sixth Alleged Breach"); Doc. No. 133-1, Renewed Mot. at 6 (explaining scope of current Motion as directed at the only remaining claim -- the "Sixth Alleged Breach").

the companies, which were then-existing electronic records (and, under Reading's argument, not included in the boxes from the paper files produced by Manson on February 23, 2010).  Reading is referring to Manson's statement that, prior to July 2009, "the financial entries for the properties were tracked in QuickBooks on a consolidated basis at the parent company level (TMG).  It was not until the settlement with Reading in July 2009 that TMG started to create stand-alone quarterly financial statements for the collateralized properties."  Doc. No. 135-1, Manson Decl. ¶ 38.  Reading contends that Manson thus admitted that he withheld TMG electronic records that concerned MBL Maryland and Lahaina C, and argued at the August 4, 2014 hearing that this meets its burden to demonstrate a material dispute for trial.  Doc. No. 158, Tr. at 49-50.

The court rejects these arguments for several reasons.  First, § 15.2 on its face does not require TMG to produce *TMG's* records such that Reading can "fully understand" or have a "complete understanding" of all of the affairs of the companies, nor does it require TMG to retroactively create new records.  Section 15.2 requires "Debtor and Company" to permit inspection of "such books, records and accounts *of Company*[.]"  Doc. No. 135-6, Def.'s Ex. 5 at TMG000191 (emphasis added).  The Pledge Agreements define "Debtor" as TMG, and "Company" as Lahaina C or MBL Maryland.  *See id.* at TMG000183; Doc. No.

135-5, Def.'s Ex. 4 at TMG000151.  The contractual obligation thus extends only

to "books, records and accounts" of Lahaina C or MBL Maryland -- not of TMG.

Section 15.3(a) requires TMG to "keep and maintain . . . in accordance with sound

accounting principles consistently applied . . . books, records and accounts

reflecting in reasonable detail all of the financial affairs."  Doc. No. 135-6, Def.'s

Ex. 5 at TMG000191.  But, as noted above, an alleged breach of § 15.3 is not

before the court.

　　　　Second, Reading has *no* evidence that contradicts Manson's detailed

Declaration explaining that he otherwise produced "all Kaiser Lahaina documents

that existed in TMG's files as of February 23, 2010" and "all West Maui Center

documents that existed in TMG's files as of February 23, 2010."  Doc. No. 135-1,

Manson Decl. ¶¶ 39[4] & 39[5].  That is, Reading has not produced evidence that

*any* relevant information in the "TMG QuickBooks" was not otherwise produced

for inspection.[13]  All it offers is argument, both in its Opposition, Doc. No. 143,

---

[13]  In Reply, TMG argues (without the support of a declaration) that "Mr. Manson produced everything in TMG's possession regarding the properties, including all the required print-outs from QuickBooks."  Doc. No. 148, Def.'s Reply at 18-19 n.5.  For this argument, TMG cites to its Response to Reading's Concise Statement of Additional Facts, where its counsel states that "Manson printed out such information on Excel spreadsheets from Quickbooks accounting data" for the February 23, 2010 inspection.  Doc. No. 150, Def.'s Resp. ¶ 11.  The court does not accept these statements from counsel as evidence, but the statements are nevertheless consistent with Manson's prior statements (which are uncontradicted and are admissible in evidence) indicating that he produced everything in TMG's possession concerning MBL Maryland and Lahaina C.

Pl.'s Opp'n at 22, and in its responsive CSF. *See* Doc. No. 144, Pl.'s CSF ¶ 35

("The records did not include *TMG* Quickbooks accountings containing

information for all three properties.") (citing Doc. No. 135-1, Manson's Decl.

¶¶ 38, 39) (emphasis added). But "arguments and statements of counsel 'are not

evidence and do not create issues of material fact capable of defeating an otherwise

valid motion for summary judgment.'" *Barcamerica Int'l USA Trust v. Tyfield*

*Importers, Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002) (quoting *Smith v. Mack*

*Trucks*, 505 F.2d 1248, 1249 (9th Cir. 1974)). Manson's Declaration that TMG

produced all Lahaina C and MBL Maryland documents is uncontested, and the

court accepts the statements as true.

       Third, Reading's theory about the "TMG QuickBooks" -- apparently

that TMG failed to produce some of *its own* records for inspection (*i.e.*, records

aside from records of MBL Maryland and Lahaina C), and thereby violated § 15.2

-- is entirely new. Reading was obligated, as ordered (twice) by Magistrate Judge

Chang, to set forth in its response to Defendant's Request for Answers to

Interrogatories "all facts that Plaintiff contends makes false or inaccurate any

statement in Defendant's response to Plaintiff's interrogatory no. 2." Doc. No.

118, Order at 6. Reading did not respond with any assertion that TMG withheld

accounting information in QuickBooks, or in any other TMG accounting system,

regarding MBL Maryland or Lahaina C.  Rather, by arguing that TMG withheld

"QuickBooks" electronic records, Reading appears to be changing its theory once

again, and attempting to create a question of fact where there is none.  Its argument

is consistent with a theme that emerges from even a cursory review of the record --

Reading appears to be focused solely on searching for defaults of the July 2009

settlement, rather than on moving forward with its terms.

        In any event, given the undisputed evidence in the record before the

court, TMG complied with its § 15.2 obligations.

## V.  <u>CONCLUSION</u>

        There is no genuine issue of material fact as to the essential aspects of

the remaining claim in this action.  Even if Reading had some basis to issue the

December 4, 2009 Notice of Default as to TMG's obligation under § 15.2 to allow

inspection of books and records of MBL Maryland and Lahaina C, it is undisputed

that TMG cured any such default by allowing such inspection on February 23,

2010.  Accordingly, the court GRANTS Defendant's Renewed Motion for

Summary Judgment.  There being no other claims, judgment shall issue in favor of

///

///

///

Defendant.  The pending Motions in this case, Doc. Nos. 139 (Motion to Quash) and 160 (Ex Parte Application for an Order/Sanctions Barring Plaintiff from Admitting Certain Evidence) are MOOT.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, August 22, 2014.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Reading Int'l, Inc. v. The Malulani Grp.*, Civ. No. 13-00133 JMS-KSC, Order Granting Defendant the Maluluani Group, Limited's Renewed Motion for Partial Summary Judgment on Plaintiff Reading International, Inc.'s Alleged Breach No. 6, Doc. No. 133